GEORGIA–PACIFIC CORP., Appellant,

v.

GREAT PLAINS BAG CO., Appellee.

Appeal No. 79–544.

United States Court of Customs and Patent Appeals.

Jan. 24, 1980.

William W. Beckett, Washington, D. C., attorney of record for appellant. Alan S. Cooper and David H. Cooper, Washington, D. C., of counsel.

Michael G. Voorhees, Des Moines, Iowa, attorney of record for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and WATSON,* Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent and Trademark Office Trademark Trial and Appeal Board (board) in cancellation No. 10,389, dismissing Georgia-Pacific's petition to cancel registration No. 911,935 of Great Plains Bag Co. (Great Plains) of the mark:

*Georgia-Pacific Corp. v. Great Plains Bag Co.*, 200 USPQ 601 (TTAB 1978). We affirm.

### Background

Great Plains filed an application for registration of the mark for use on paper and plastic bags on January 23, 1970, alleging a first use of September 1, 1961. The registration was issued on June 8, 1971.

Georgia-Pacific petitioned for cancellation of the mark on July 11, 1973, on the grounds that it had been and is still engaged in the manufacture and sale in interstate commerce of a variety of forestry products including, specifically, paper bags and Kraft paper; it is owner of the trademark G–P, which mark has been used extensively as a portion of its corporate logo and on its various goods long prior to Great Plains' first use in 1961; it is the owner of registrations for a number of marks containing the letters G–P for use on lumber

---

* The Honorable James L. Watson, United States Customs Court, sitting by designation.

and plywood. Finally, Georgia-Pacific alleged that Great Plains' mark, as used on paper and plastic bags, so resembles its own mark as applied to its goods as to be likely to cause confusion, mistake or deception regarding the source of the goods.

Great Plains averred that Georgia-Pacific was barred from bringing the cancellation proceeding by reason of laches and estoppel. It argued that since the parties had engaged in various business dealings since 1962, including the sale of Kraft paper by Georgia-Pacific to Great Plains, Georgia-Pacific knew, or should have known, of its use of the mark in its corporate logo (said logo appearing on its bags, stationery and envelopes since 1961). Georgia-Pacific's failure to object to the use of the logo and the subsequent increase in its use results in Georgia-Pacific now being estopped from asserting a likelihood of confusion between the respective marks and from asserting that it would be damaged by this registration.

*Board*

The board found that Georgia-Pacific's use of the designation G–P has been well known in the lumber industry since the late 1940's both as an identification of the corporate entity and a trade designation identifying its marketed products.

The board admitted into evidence a survey (conducted for use in another proceeding) which tended to show that the verbal letters G–P were recognized, both by sixty percent of a group of executives from various paper purchasing companies and additionally by twenty-five percent of a group of regular readers of the *Wall Street Journal*, as a term representing Georgia-Pacific. Great Plains objected to admission of the survey on the basis of hearsay since without the inclusion of the interview sheets and recorded responses, the accuracy of the survey could not be verified. The individuals who conducted and designed the survey were deposed and made available for cross-examination. The board concluded that the survey should be admitted for consideration of the probative value to be attached thereto. The survey was qualified to sustain a recognition of G–P with Georgia-Pacific in the paper industry.

The board indicated that it is well settled in trademark law that the defenses of laches and estoppel are based on the concept that the owner and prior user of a mark having actual or constructive notice of another party's use of the same or similar mark for like or similar goods must be persevering. He must not sit on those rights for an exorbitant length of time and allow the subsequent user to build up a business and good will associated with such mark before taking action against that use.

To prove the defense of laches one must make a showing that the party, against which the defense is asserted, had actual knowledge of trademark use by the party claiming the defense or at least a showing that it would have been inconceivable that the party charged with laches would have been unaware of the use of the mark. *Loma Linda Food Co. v. Thomson & Taylor Spice Co.*, 279 F.2d 522, 47 CCPA 1071, 126 USPQ 261 (1960).

The board indicated that circumstantial evidence appeared to be overwhelming on the concept that Georgia-Pacific must have been aware of Great Plains' use of its logo containing the letters G–P.

The board detailed the evidence by Great Plains which would show the requisite knowledge. It pointed out that a vice-president of Georgia-Pacific visited the president of Great Plains to discuss a joint venture. A large corporate logo was present on a wall behind the receptionist's desk at the time of that visit. Numerous visits by salesmen and sales managers of Georgia-Pacific to two of Great Plains' locations were catalogued. Each salesman would have had to pass a large outside sign bearing Great Plains' G–P logo. Several sales of paper were made by Georgia-Pacific to Great Plains. Great Plains picked up the paper in trucks bearing the corporate logo, paid for it using checks using the corporate logo, and confirmed several of its telephone orders using purchase orders bearing the corporate logo.

Georgia-Pacific argues that Great Plains has produced evidence showing only that lower echelon employees (clerks, bookkeepers, dock workers) might have seen Great Plains' usage of the mark. Since no employee specifically charged with policing trademark infringement matters saw the usage, a corporation as large as Georgia-Pacific should not be charged with such knowledge. The board concluded that notice to a corporation via its sales personnel constitutes sufficient notice for the support of the equitable defenses of laches. Alternatively, the absence of question by the sales force concerning that mark's usage was considered as evidence that no likelihood of confusion exists.

Finally, the board considered the parties' respective marks on paper bags. Great Plains' mark, it is said, being a distinctive design mark, requires some effort to discern the letters G–P. For that reason, the board found "considerable doubt" existed that a prospective purchaser would equate the two marks or even form an association between them.

The board therefore concluded that the differences in the marks were sufficient to make the question of likelihood of confusion reasonably debatable and therefore to give effect to Great Plains' equitable defenses. Georgia-Pacific was held guilty of laches and estopped from asserting that it is and will be damaged by Great Plains' registration.

## OPINION

■ All evidence tending to prove or disprove a likelihood of confusion between two marks must be considered. *In re E. I. du Pont de Nemours*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

Georgia-Pacific argues that the board expressly held that "the Great Plains mark comprises the identical letters GP" as used by Georgia-Pacific. The board opinion fails to provide support for such an argument. The board did indicate that the Great Plains mark "while incorporating the letters 'GP,' can by no means be considered a literal mark" but, instead, "projects the image of a distinctive design mark." We agree with the board on this point. A subjective comparison of the marks in their commercial setting, i. e., on paper bags, does not convince us that the marks are sufficiently similar to draw one into the conclusion that the goods had a common source. *See In re Anderson Electric Co.*, 370 F.2d 593, 54 CCPA 931, 152 USPQ 245 (1967).

Georgia-Pacific argues that the Great Plains trademark is nevertheless clearly recognizable as the letters GP and therefore vocalized in the same way. Georgia-Pacific points to the testimony of both the former president of Great Plains and the individual in charge of its advertising and promotion, in which they refer to Great Plains' logo as GP, as evidence of the argued vocalization.

[3] It must be remembered that Great Plains' trademark consists of highly stylized letters and is therefore in the gray region between pure design marks which cannot be vocalized and word marks which are clearly intended to be. *In re Burndy*, 300 F.2d 938, 49 CCPA 967, 133 USPQ 196 (1962). Even accepting the argument that the mark could be verbalized, such is not the end of the inquiry. Verbalization of the mark must be considered within the environs of the marketplace. The testimony of Mr. Naudain, vice-president of Georgia-Pacific, Mr. Pomerantz, former president of Great Plains, and Mr. Stearley, current president of Great Plains showed them to be in general agreement that purchasers in this market are of a fairly discriminating nature. Mr. Naudain, for instance, testified as follows:

Q. Was it your experience when this—when you dealt with customers and tried to convince them to change from a corrugated container to a multi-wall bag, was it your experience that the customer was very discriminating, with respect to the companies that he was dealing with when this was done? In other words, did he take care to know who he was dealing with?

A. Yes, yes; the answer to that is yes.

Q. And he was a businessman? You would be dealing, for example, with a purchasing agent; is that correct?

A. Purchasing agent, purchasing director, Vice-President of Purchasing.

MR. WARD: We assume if they were dealing with Mr. Naudain they were taking great care to know who they were dealing with. I will stipulate to that.

MR. VOORHEES: All right.[1]

Q. A person that would be, for example, a purchasing agent, he would be a man who business it is to know who makes what product and ____

A. Yes.

Q. __ where it comes from?

A. Sure.

■ Accordingly, we consider the question of whether possible verbalization of the marks produces confusion to be adequately answered by the testimony that those who would be the ones to verbalize are also sufficiently sophisticated in the pertinent goods to know whose trademark they are verbalizing.

Georgia-Pacific argues that the factors of priority of use and fame of the mark should be given great weight in determining likelihood of confusion under *Tiffany and Co. v. National Gypsum Co.*, 459 F.2d 527, 59 CCPA 1063, 173 USPQ 793 (1972).

The record makes it quite clear that Georgia-Pacific was the first to use its mark G–P. The only evidence supporting the argument that the mark is famous appears to be the 1972 survey produced in conjunction with another matter. That survey only produced a discernible connection between the verbalized letters G–P and Georgia-Pacific in the paper industry. However, that is not the issue. The question to be resolved is the existence of a likelihood of confusion regarding the respective *trademarks*, not their verbalization. Even giving this survey all possible weight, it does not appear to show the mark to be so famous as to bridge the gap between the G–P and Great Plains' stylized mark and to create confusion.

Georgia-Pacific contends that the board gave insufficient weight to the evidence of actual confusion in the marketplace. That evidence consisted of the testimony of Mr. Schinner, a customer of Georgia-Pacific and jobber for its bags:

A. Our customer based in Appleton called us and said that he could purchase bags at a price of five percent below what we were currently charging him. I asked him who the quote or the competitor was, and he told me it was G.P. I then called Georgia-Pacific or G.P. in Chicago to inquire if they dropped their price of bags, particularly in the Minneapolis area where the price apparently was dropped. They assured me they had not and they had not heard of this, of someone lowering the price five percent. I then called Gulf States Paper to see if they had heard of this, because Gulf States was participating in part of the business with the parent company at Minneapolis. They did have a part of that bag business, and I assume that Gulf States would be aware if any competitor went in there and lowered the price that they certainly would be made aware of it. I mentioned to Gulf States of this five percent decline and they said—I told them that the customer said it was G.P. I also told Gulf States, checked with Georgia-Pacific, and they did not. They said that they had no knowledge of it.

Q. 23 At that time did the customer believe that the quote was for Georgia-Pacific G.P. bags?

* * * * * *

A. Our customer in Appleton thought that G.P. was Georgia-Pacific, and this was why he was so concerned.

Q. 25 He told you that?

A. My customer told me this, yes. How come I am buying Georgia-Pacific bags or G.P. bags and I'm paying you five percent more than our main company can purchase them out of Minneapolis?

To get back to my conversation with Gulf States, Gulf States at that point when I explained that Georgia-Pacific said that they had no knowledge of this five percent decline in price, Gulf States at that point said, "well, then, it probably was Great Plains", and now that was the

---

1. Mr. Ward is counsel for Georgia-Pacific and Mr. Voorhees for Great Plains.

first time I had heard of Great Plains or even heard of Great Plains being referred to as G.P.

Q. 26 Gulf States had had some prior information as to Great Plains?

A. Right.

Q. 27 What happened after that? Did you go back to your customer, and did you sort it out?

A. We met the competitive situation. It developed that Great Plains was the mill that was quoting the lower price in Minneapolis, and this is where the price was quoted.

\* \* \* \* \* \*

Q. 30 How was it determined, if it was determined, that the bags offered in Minneapolis were not Georgia-Pacific's G.P. bags?

A. Gulf States informed me after a few days' checking to find out who or where the competition was coming from. Gulf States told me that it was Great Plains that quoted the price.

Q. 31 Did your customer. determine that also from communications with the buyer in Minneapolis?

A. He confirmed that at a later date.

Q. 32 You say after a few days of checking. Did it take some time to determine just what the source of these "G.P." bags were?

A. Yes.

Q. 33 Now, prior to that incident, had you ever heard of any company using G.P. on bags of any type?

A. No.

Q. 34 Other than Georgia-Pacific?

A. No.

Q. 35 Could you identify the customer in Appleton, Wisconsin, and the company in Minneapolis?

A. The customer is S. C. Schannon Company in Appleton. The parent company is Nash-Finch.

 We agree with Great Plains that the evidence showing actual confusion is only hearsay and entitled to little weight. It is offered to prove the state of mind of a third party (concerning confusion between the two marks) or his statements. Actual confusion is entitled to great weight but only if properly proven. Cf. *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 186 USPQ 73 (5th Cir. 1975) (actual confusion evidenced by testimony of four individuals). Such is not the case here.

Finally, Great Plains urges that Georgia-Pacific should be charged with estoppel for laches in that it failed to object to Great Plains' use of the mark even though certain employees of Georgia-Pacific were shown to have seen that company's logo. Great Plains maintains that its expanded use of the logo throughout the years would be prejudiced if Georgia-Pacific were to prevail.

Georgia-Pacific counters by noting that Great Plains has not shown that any employee of Georgia-Pacific has ever seen a technical use of the trademark, i. e., the mark on a paper bag. It is argued that under *Bassett v. Scholl*, 388 F.2d 1014, 55 CCPA 821, 156 USPQ 244 (1968), use of a mark apart from trademark use will not trigger laches. We do not agree that *Bassett* provides as rigid a rule as is argued. In *Bassett*, a letter soliciting the purchase of TRIM toenail clippers having the "exclusive 'chiropedic' cutting edge" was received by Scholl's advertising director. CHIROPEDIC was the mark in issue. The totality of circumstances surrounding that letter made it reasonable to believe that "chiropedic" was used only in a descriptive sense and had little if anything to do with any intended trademark use.

 In the case at hand, Great Plains has introduced significant circumstantial proof [2] that on a number of occasions salesmen from Georgia-Pacific were exposed to the corporate logo during the course of their duties in selling Kraft paper to Great Plains and knew that that paper was to be

---

2. The evidence is sufficient to meet the standard set forth in *Loma Linda Food Co. v. Thompson & Taylor Spice Co.*, supra, that it is inconceivable that the party charged with laches would have been unaware of the use of the mark. At least with regard to the salesmen employed by Georgia-Pacific, the number of

used in the production of bags.[3] Georgia-Pacific argues that only its lower echelon personnel were said to have observed Great Plains' use of the mark. We agree that knowledge of mark usage gained by bookkeepers in receiving checks and dock workers in loading Great Plains' trucks should not normally be imputed to the corporation. Their duties are not of the type that would require sensitivity of the value of their employer's marks in the marketplace. However, salespeople produce the "stuff" of which a corporation's "good will" is made. Salespeople, if they are to be effective, must be present in the marketplace and cognizant of the various factors that effect present and future sales. Product "good will" is one such factor. A corporation which employs a professional salesperson who has knowledge of an offending trademark use will have imputed to it the knowledge of that employee. *Dawn Donut v. Hart's Food Stores*, 267 F.2d 358, 363, 121 USPQ 430, 434 (2d Cir. 1959).

 Other evidence tending to show Georgia-Pacific's "corporate" awareness of Great Plains' use of the mark include Stearley's testimony[4] that Great Plains sold a significant number of multi-wall bags to Georgia-Pacific and that virtually all multi-wall bags produced by Great Plains had a logo imprinted thereon. In total, over thirty transactions (including nine sales of paper) took place between 1962 and 1969.

The totality of the evidence points to the existence of constructive knowledge by Georgia-Pacific of Great Plains' use of the mark.

It is well settled that one who charges estoppel by laches must also show that it suffered or will suffer detriment as a result of inaction by the party against which laches is charged. *United States v.*

*Alex Dussel Iron Works*, 31 F.2d 535 (5th Cir. 1929). Great Plains has shown that sales of its goods under the logo in question have grown from $372,000 in 1961 to about $28,000,000 in 1973. It is this extent of sales over a protracted length of time without complaint from Georgia-Pacific upon which Great Plains relied to its detriment. Any change in trademark status at this point would be to the prejudice of Great Plains.

### Conclusion

 In sum, we hold the likelihood of confusion between the marks as applied to their respective goods unlikely and further hold that Georgia-Pacific is estopped from asserting such likelihood. Therefore, we *affirm* the decision of the board.

AFFIRMED.

---

contacts with Great Plains' corporate logo is shown to be numerous.

**3.** The testimony of various witnesses, including that of Mr. Schinner, supra, leads us to the conclusion that multiwall paper bags and grocery bags often come from the same sales source. Therefore, Georgia-Pacific had at least a passing duty to challenge those who interjected themselves into its product area or into its

derivative product area *if* it wished to prevent others from using what it considered to be a similar trademark in its market.

**4.** Mr. Stearley, on the occasion of the deposition, was President and General Manager of Great Plains Bag Corporation and had been with that company in various capacities since 1963.