**OFFICIAL AIRLINE GUIDES,
INC., Plaintiff,**

v.

**CHURCHFIELD PUBLICATIONS, INC.,
Ashbyweb Limited Company, Inc., dba
American Concepts, and Anne–Lise
Fleisher, an individual, Defendants.**

**Civ. No. 87–6015–BE.**

United States District Court,
D. Oregon.

Nov. 23, 1990.

Richard E. Alexander, Emrich & Dithmar, Chicago, Ill., Peter H. Koehler, Jr., Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for plaintiff.

Dennis E. Stenzel, Chernoff, Vilhauer, McClung & Stenzel, Portland, Or., for defendants.

## AMENDED OPINION

REDDEN, Chief Judge.

On September 14, 1990, the court bifurcated Official Airline Guides' claim for trademark infringement from defendants' counterclaim for intentional interference with business relations. Commencing on September 18, 1990, the parties tried the first phase of this action to the court. Defendants' counterclaim will be tried to a jury at a later date. Official Airline Guides, Inc. ("OAG") seeks a permanent injunction, enjoining defendants, Churchfield Publications ("Churchfield"), Ashbyweb Limited Company ("Ashbyweb") and Anne–Lise Fleisher ("Fleisher"), from using the logos "The Travel Planner," "USA Travel Planner" and "The Travel Planner USA" on their travel directory and in their advertising and promotional materials. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the following constitute my findings of facts and conclusions of law.

### FACTS

#### A. *OAG Travel Planner*

Since 1929, OAG has published travel directories. Currently, OAG publishes and distributes three editions of a travel planner: a North American Edition, a European Edition and a Pacific Asian Edition. Published quarterly, each edition is titled "OAG Travel Planner." The directories contain listings of travel and hospitality services, including information about hotels, motels, ground transportation and airline offices in various cities throughout the United States and abroad. The listings are in alphabetical order by city with direct phone numbers. OAG's directory also contains a section of "800" numbers, usable only in the United States.

OAG primarily distributes its North American Edition[1] in the United States. Evidence established that about one percent of the North American Edition is distributed in Europe or other countries. The primary subscribers to "OAG Travel Planner" are travel agents, corporate travel coordinators and frequent fliers. Envelopes sent to OAG's office by customers and advertisers commonly refer to OAG's publication as "OAG Travel Planner."

---

**1.** The North American Edition is the edition at   issue in this action.

To compile the listings, OAG sends forms directly to travel and hospitality establishments. If establishments are already listed in an OAG directory, OAG sends a copy of the establishments' prior listing form and asks for any corrections. OAG inspects and verifies the listings carefully before final publication.

OAG also solicits advertisements for its directories by direct mail. The advertisements are custom designed for travel vendors, airlines and hotels. OAG generally attracts elite organizations, charging rates that are higher than similar publications. OAG receives approximately 65 percent of its revenue from advertising sales and 40 to 45 percent of its revenue from subscribers. Currently, OAG has 70,000 subscribers for its three editions.

On May 31, 1966, OAG obtained federal trademark protection and ownership rights for its mark "OAG Travel Planner," Registration Number 809,293. Registration No. 809,293 disclaimed the words "Travel Planner." On September 1, 1987, OAG obtained a second trademark, Registration Number 1,455,261, without disclaiming the words "Travel Planner." In support of OAG's application, Craig Johnson, who currently is OAG's vice president of Sales and Marketing, filed an affidavit dated March 19, 1987. He asserted that he believed "that portion of the mark consisting of 'TRAVEL PLANNER' has become distinctive as applied to applicant's goods as a result of applicant's substantially exclusive and continuous use in interstate commerce for more than ... five years." Plaintiff's Exhibit 251. Currently, a third application for registration of OAG's trademark is pending. Ashbyweb has contested this application claiming that it has a superior right to the name "Travel Planner." The decision on the application depends on the outcome of this action.

### B. *USA Travel Planner*

Since 1983, defendants promoted, sold, distributed, and solicited advertisements for a travel directory similar to OAG's travel planner. Defendants' principals have known of OAG's travel planner for over 20 years.

Ashbyweb is incorporated in the United Kingdom with its principal place of business located in Scotland. Anne–Lise Fleisher is the primary stockholder of Ashbyweb. Churchfield Publications, which was located in Las Vegas, Nevada, is the predecessor of Ashbyweb and was owned by Anne–Lise Fleisher's parents, Bjarne and Margrethe Persson. The Perssons were nominally involved in the publication of Churchfield's directory by arranging for the binding. Anne–Lise Fleisher was a paid consultant to Churchfield, and Ms. Fleisher's husband, Van Fleisher, was an unpaid advisor. At the time Churchfield published its directory, Van Fleisher was employed by Trans World Airlines ("TWA") and was the Director of International Sales in charge of TWA's advertising outside of the United States.

In 1983, Ashbyweb began to distribute in Europe trade and consumer versions of travel directories which were under the names of "The Travel Planner USA," "USA Travel Planner" and "The Travel Planner" (hereinafter referred to as "The Travel Planner"). The directory was distributed in Europe and the Middle East and was not distributed in the United States. Neither the name "Ashbyweb" nor "Churchfield" appeared on their listing form, on the cover letter accompanying the listing forms or on the actual publication.

The Fleishers approached various organizations seeking a sponsor. Van Fleisher testified that he spoke with a representative of OAG in London in regard to sponsoring defendants' publication. That representative was not interested because the defendants desired to list travel services by state and not city. In 1982, Van Fleisher asked TWA to sponsor their travel directory by buying in bulk and distributing it to travel agents in Europe. Van Fleisher informed his superior in the advertising department that his in-laws owned Churchfield but he did not inform TWA's legal department.

TWA negotiated a contract with Churchfield through Anne–Lise Fleisher and

agreed to underwrite Churchfield's publication with a budget of one and a half million dollars. In 1983, in the first edition, TWA's name appeared within the title of the publication. In the next edition, the publication was titled "The Travel Planner–USA," and TWA's name was printed on the bottom of the cover and on the spine. Initially, TWA used its stationery to solicit advertisements and mailed the listing forms to various hotels, motels, car rental agencies and other travel related organizations.

Defendants then obtained their listings by sending forms which were headed "The Travel Planner" to various travel and hospitality establishments. The listing forms did not make reference to either TWA or Churchfield publications. Defendants, like OAG, solicited advertisements from hotels, car rental agencies and airline offices. However, defendants also sent forms to a number of entities generally not solicited by OAG, including national parks, recreational vehicle rental agencies, charter bus lines, rail lines and tourist attractions. Defendants occasionally received misdirected listing forms from different publications. Anne–Lise Fleisher, however, did not return the listing forms to the other publications because she thought that the copies were intended for her business.

TWA and Anna–Lise Fleisher designed "The Travel Planner" to accommodate foreigners traveling to the United States. The listings are made by states, not by cities; the phone numbers of the various establishments are either Watts lines or direct lines; and most of the advertisements of United States establishments list Watts line numbers and are written for European travelers. The directory also includes information about travel documents and information about Bed and Breakfast establishments. Defendants included Bed and Breakfast information because Europeans are accustomed to lodging at establishments similar to Bed and Breakfast hotels. Churchfield and TWA designed the publications for overseas travel agents.

Churchfield primarily earned its revenue from selling the directory by bulk and did not attempt to sell individual subscriptions of "The Travel Planner." TWA sold a few subscriptions from the bulk purchase it made. The numbers in circulation varied between 10,000 and 20,000 each year. In 1983 and 1984, approximately 10,000 existed; in 1985, approximately 30,000 existed; in 1986 approximately 20,000 existed; and in 1987, approximately 13,000 existed. Between 1984 and 1986, TWA distributed the copies to travel agents in Europe as a giveaway in order to encourage agents to book their clients on TWA. In 1985, TWA did not renew its contract with Churchfield. The same year, JETWAYS overpurchased directories. In 1986, JETWAYS used 5,000 publications from the previous year which were still on hand.

In 1986, Churchfield, through Bjarne and Margrethe Persson, assigned all of its rights to Ashbyweb with Anne–Lise Fleisher as the primary shareholder. Fleisher contracted with Pan American Airlines ("Pan Am") to sponsor "The Travel Planner" and distributed it to agents in Europe. Pan Am's name appeared on the cover of the 1987–88 directory. The 1987–1988 directory was the last directory published by defendants. Defendants ceased publication pending resolution of this litigation. Defendants intend to resume business when this litigation is resolved. Plaintiff did not urge its affirmative defense of abandonment.

Mindy's Answering Service ("Mindy's"), an Oregon business, is an agent of defendants and Van Fleisher. Mindy's contracted with defendants to receive their mail and telephone calls from potential listers and advertisers for defendants' publication. Mindy's personnel answered simple questions and mailed listing forms. Companies wishing to advertise in defendants' directory would return their listing forms to Mindy's. Mindy's address and phone number were listed on "The Travel Planner's" listing forms. Mindy's was dropped as a defendant prior to trial.

Defendants also had an office in London, England located on Jermyn Street. The Jermyn Street building housed various businesses, in which small and foreign

businesses shared receptionists, secretaries and office space. A conference room was available and used by Anne–Lise Fleisher for meetings. TWA also had an office in the same building.

### C. OAG's Interaction with Defendants

In 1987, advertisers mistakenly sent six copies of Ashbyweb's listing forms to OAG. As a result, OAG requested Ashbyweb to cease and desist using the term "Travel Planner." Defendants did not comply. They contended that "OAG" had known about "The Travel Planner" prior to receiving the misdirected listing forms.

The evidence established that around 1984, Brian Kirby, who was employed in OAG's London office as the circulation manager, received a copy of "The Travel Planner USA" and notified OAG's Oakbrook office. He kept the book in his office for some time, and then sent a copy to Marge Nester at the Oakbrook, Illinois office. He did not send the publication to OAG immediately because he did not regard defendants' publication as competitive with the "OAG Travel Planner." In July, 1984, Marge Nester received misdirected copies of defendants' listing forms and returned them to Fleisher. OAG did not then contact defendants regarding an infringement.

Defendants advertised "The Travel Planner" in the newsletter at an international trade show. OAG, through its Magazine Travel Division, sponsored and printed the newsletter. Also in 1987 OAG requested Kirby to send any publications using the term "travel planner" to OAG. Anne–Lise Fleisher subsequently insisted that OAG did not have a right to require Ashbyweb to discontinue its use of its logos.

In 1987, OAG brought this action and was granted a Temporary Restraining Order but was denied a preliminary injunction. When Craig Johnson testified at the preliminary injunction hearing, third party travel guides with titles "Travel Planner"

were shown to Craig Johnson and other OAG officials. The Ninth Circuit affirmed the district court's denial of the preliminary injunction, but remanded for trial to decide if a permanent injunction is warranted. *Official Airline Guides, Inc. v. Goss*, 856 F.2d 85 (9th Cir.1988).

OAG now seeks a permanent injunction against defendants, prohibiting them from using the terms "The Travel Planner", "The Travel Planner USA" and "USA Travel Planner." OAG alleges four counts: 1) Federal Trademark Infringement under 15 U.S.C. § 1114(1)(a), 2) False Description and False Designation of Origin under 15 U.S.C. § 1125(a), 3) Trademark Infringement and Unfair Competition Under Oregon Common Law; and 4) Disseminating Material Containing False Description and False Representation as to the Nature of Defendants' Business Under 15 U.S.C. § 1125(a). Defendants raised two affirmative defenses: 1) that OAG is estopped by laches; and 2) that OAG is guilty of unclean hands in procuring the trademark Registration number 1,455,261 because the registration was allegedly obtained by false or fraudulent representations to the United States Patent and Trademark Office.

At trial, defendants' witnesses from the travel industry testified that they regarded the mark as generic. They also testified that they were not confused as to "OAG Travel Planner." Each testified that they thought that the mark was generic and/or described a publication that helped one to plan travel. The witnesses also testified that they have not confused the defendants' publication with OAG's publication. Defendants also introduced third party guides that used the term "travel planner" in their titles.

### DISCUSSION

■ OAG claims [2] that the titles of defendants' publication, "The Travel Plan-

---

objection are overruled, as the telephone testimony was made in open court and under oath. The court had a greater opportunity to evaluate the credibility of the witnesses through tele-

ner," "The Travel Planner USA" and "USA Travel Planner" infringed on OAG's protected trademark "OAG Travel Planner." OAG also claims that defendants disseminated advertising and promotional material which falsely and deceptively described the nature and character of defendants' business. I will first discuss plaintiff's claim for trademark infringement.

## I. Trademark Infringement

Plaintiff must prove that its trademark is protectable, and if so, OAG must prove likelihood of confusion between its "OAG Travel Planner" and "The Travel Planner," "Travel Planner USA" or "USA Travel Planner." *Official Airline Guides, Inc. v. Goss*, 856 F.2d 85, 88 (9th Cir.1988). OAG contends that it is entitled to protection of its federally registered trademark "OAG Travel Planner," but does not contend that it is entitled to protection of the term "travel planner" standing alone.

### A. *Valid Trademark*

On remand, the Ninth Circuit affirmed the district court's denial of a preliminary injunction but instructed this court to determine if OAG has a common law right to the term "Travel Planner." The Ninth Circuit held that "[t]he arrangement of letters 'OAG'—as coupled with the more descriptive term 'Travel Planner'—constitutes an arbitrary mark that qualifies for trademark protection without the need to prove secondary meaning." *Official Airline Guides*, 856 F.2d at 87. Since the Ninth Circuit decision OAG has registered its trademark "OAG Travel Planner" without disclaiming the term "travel planner," registration number 1,455,261. Because the court has already determined that the term "OAG Travel Planner" is arbitrary and because OAG now has registered the mark without disclaiming "travel Planner," the term "travel planner" receives protection when coupled with the term "OAG."

■ Defendants assert an affirmative defense that OAG procured the registration of trademark 1,455,261 by fraud. A fraudulently obtained trademark is not protectable. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir. 1982). Defendants contend that Craig Johnson misrepresented to the Patent and Trademark office that OAG has had continuous and exclusive use of the term "travel planner" for five years preceding the application. Defendants also contend that OAG committed fraud by not reporting that the term "travel planner" may be generic.

■ To establish fraud, defendants must demonstrate that Craig Johnson deliberately attempted to mislead the Patent and Trademark Office into registering OAG's mark. *Id.* Defendants, however, are not required to investigate and to report all other possible users of an identical or confusingly similar mark. *See Id.* An applicant for a trademark registration is required to make a statement under oath that, to the best of his knowledge, he or the company is the owner of the mark and that no other person or organization has the right to use such mark "in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when applied to the good of such person, to cause confusion, or to cause mistake or to deceive." 15 U.S.C. § 1051.

■ The evidence established that Craig Johnson did not deliberately attempt to mislead the Patent Office, even though Johnson was aware of third party uses of the term "travel planner" and was aware of the defendants' use of the same term. Johnson, however, stated in his affidavit that OAG has had exclusive use of the mark "travel planner" as "applied to applicant's goods." Johnson knew that OAG had used the term "OAG Travel Planner" since 1964. Johnson believed that the third party publications were not applied to OAG's goods because they were not in the same market as OAG's travel directory. He did not report defendants' publications to the Patent Office because he believed that defendants had no right to the use of the term "travel planner." Johnson's

phone testimony than through deposition testimony offered by both parties. Plaintiff also

offered the telephone testimony of a witness located in London, England.

statement is based in fact and on his own belief. Scienter to mislead the ·Patent Office was not proved. *See San Juan Products, Inc. v. San Juan Pools, Inc.*, 849 F.2d 468, 473 (10th Cir.1988). Therefore, plaintiff's trademark "OAG Travel Planner" is thus protected.

### B. *Likelihood of Confusion*

OAG must prove that a likelihood of confusion exists between defendants' logos and its mark. "Likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 604 (9th Cir.1987). OAG must either prove that the subscribers of the directories are likely to confuse defendants' product for OAG's publication or that the advertisers and listers therein are likely to confuse them. *See Official Airline Guides*, 856 F.2d at 88 ("The district court ... failed to consider the effect of Ashbyweb's use of the term 'Travel Planner' to solicit advertisements.")

If defendants directly competed for sales with those of OAG, the court needs only to determine whether the marks are sufficiently similar so that confusion can be expected. *AMF Incorporated · v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). If the publications, however, are related but not in direct competition, several other factors are considered to determine if a likelihood of confusion exists. *Id.*

■ Defendants' publications are exclusively distributed outside the United States, whereas OAG's planner is primarily distributed within the United States; the advertisements placed in defendants' publication are designed for the European market, whereas OAG's travel planner is designed primarily for the American market; both general tourist and business travelers use defendants' publications, whereas tourists do not generally use OAG's publication; and the cost of an advertisement in OAG's directory is substantially higher than the cost of an advertisement in defendants'

directory. Defendants' publication is related to OAG's but it is not in direct competition. The court, therefore, must consider each of the relevant factors to determine if the defendants' logos infringed OAG's trademark.

In determining whether confusion between related goods are likely, the following factors are relevant:

1) the strength of the mark;

2) the proximity of the goods;

3) marketing channels used;

4) similarity of the marks;

5) evidence of actual confusion;

6) type of goods and the degree of care likely to be exercised by the purchaser;

7) defendant's intent in selecting the mark; and

8) likelihood of expansion of the product lines.

*AMF Inc.*, 599 F.2d at 348; *Nutri/System, Inc.*, 809 F.2d at 604.

### 1. Strength of the Mark

A strong mark, such as an arbitrary or fanciful mark, is distinctive from other marks and receives the widest protection. *AMF, Inc.*, 599 F.2d at 348. Although the Ninth Circuit has held that the term "OAG Travel Planner" is arbitrary, *Official Airline Guide*, 856 F.2d at 87, the term "travel planner" standing alone is not a strong mark. Since their term "Travel Planner" is the common term in both directories, I will consider the strength of the "travel planner." The Ninth Circuit stated that the term "travel planner" is more descriptive and thus, may not receive full protection. *See Id.*

If a term is descriptive, plaintiff must demonstrate secondary meaning. *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791, 792 (9th Cir.1982). To demonstrate secondary meaning, OAG must show that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* OAG has submitted envelopes addressed to "OAG Trav-

el Planner"[3] which tends to demonstrate that the advertisers and listers of OAG associate OAG with the term "Travel Planner."

Defendants, however, have produced evidence that people in the travel profession consider the term "travel planner" to describe a book which helps to plan travel and that they do not necessarily associate this term with "OAG Travel Planner." Defendants also have submitted regional travel directories which use the term travel planner.[4] Even though the third party publications are not in the same market, they demonstrate that "travel planner" is a commonly used term and an advertiser would not necessarily associate it with OAG. Although OAG's mark is protectable, the term "Travel Planner" is descriptive and, thus, weak. OAG must also demonstrate that the terms are similar and the goods are closely related to find an infringement. *See AMF, Inc.,* 599 F.2d at 350.

## 2. Proximity of the Markets

To demonstrate proximity of the terms, OAG must show that consumers will associate defendants' publication with OAG's travel planner. *Nutri/System,* 809 F.2d at 606. The more likely the advertisers or other consumers make such an association, the less evidence plaintiff needs to demonstrate in order to prove similarity. *AMF, Inc.,* 599 F.2d at 350. The goods here are related in that both directories are used to plan travel within the United States, and both list hotel, airline offices and car rental agencies.

Defendants' publication, however, is distributed exclusively outside of the United States, and lists services also tailored to general tourist use. The advertisers solicited by defendants direct their displays at the European market. In comparison, OAG distributes its publication primarily within the United States. OAG advertise-

ment costs are substantially higher than defendants' costs. The goods are related but not so closely that the diminished standard of similarity will be applied in comparisons. *AMF, Inc.,* 599 F.2d at 350.

## 3. Similarity

"Similarity of the marks is tested on three levels: sight, sound and meaning ... [and] each must be considered as they are encountered in the market place." *Id.* at 351. Similarities of the term weigh more heavily than other factors. *Id.* The parties' terms are similar in that they both contain "Travel Planner." OAG's mark is written in medium size letters across the top of the cover with OAG written in a different color than "Travel Planner." Above the mark, OAG identifies the edition, i.e., North American Edition, and under the mark, OAG specifies that the publication is a "Hotel and Motel Red Book." The full title covers approximately one eighth of the cover.

Defendants use the terms "The Travel Planner USA" and "USA Travel Planner" on the cover of their publication. These logos appear substantially different than OAG's mark. The term "The Travel Planner" covers about an eighth of the page and is written at a slant. The letters "USA" are printed below the term "The Travel Planner," and "USA" covers more than half the page. A subscriber or an advertiser would not mistake the cover of the 1984 through 1986 editions of the "The Travel Planner USA" for OAG's. On the 1987–1988 edition, defendants changed the cover so that "Pan Am" is followed by "USA" then "Travel Planner." These terms were written in a small box at the top of the page, covering about one fourth of the page. Again a consumer would not visually mistake defendants' 1987–88 edition for OAG's publication.

---

**3.** Defendants objected to plaintiff entering envelopes addressed to OAG. The court recognizes that the plaintiff may have selectively submitted the envelopes but finds that the envelopes are relevant to demonstrating consumer perception.

**4.** Plaintiff objected to admitting the third part guides on the grounds that they are not from the same market as OAG's and are irrelevant. The third party guides are entered for the limited purpose of demonstrating common use of the term "travel planner."

The sound or meaning of "OAG Travel Planner" is not similar to "The Travel Planner USA" or "USA Travel Planner." "OAG" is an arbitrary word, and is an abbreviation for the name of the corporation; in comparison, "USA" is a descriptive word which does not have secondary meaning. Even though OAG and USA are three letter words, they do not sound alike and a consumer would not confuse USA for OAG. "OAG Travel Planner" and "The Travel Planner USA" or "USA Travel Planner" are not so similar as to warrant a finding of infringement based on similarity of the mark.

The defendants also use the logo "The Travel Planner" standing alone. The term "The Travel Planner" is the only logo used on defendants' letterhead, and advertisement and listing forms. "The Travel Planner" also appears on the first page of defendants' directory. The term "The Travel Planner" standing alone looks similar to OAG's mark because both logos use the term "travel planner." "OAG Travel Planner," the term "travel planner" is set off from OAG because "OAG" is printed in a different color than "travel planner." "The Travel Planner" stands alone on defendants' advertising forms; an advertiser, would view the two logos and would associate "The Travel Planner" with OAG's mark.

"OAG Travel Planner" and "The Travel Planner" also have similar meanings. Travel Planner is a descriptive term that identifies a book which helps to plan travel, and both parties' logos have such a meaning. The descriptive term "travel planner" is distinguished by the term "OAG" which identifies the travel planner as belonging to Official Airline Guides, Inc. Defendants, however, only distinguish the term "Travel Planner" with the article "the." "The" specifies a particular travel planner without identifying the owner of the publication. An advertiser or a subscriber is likely to confuse the meaning of defendants' logo for the meaning of OAG's mark. Similarities in sight and meaning exist.

### 4. The Marketing Channels

Convergent marketing channels increase the likelihood of confusion. *Nutri/System*, 809 F.2d at 606. Both parties have two marketing channels. They market their publications to users such as travel agents and to advertisers such as hotels and airlines. OAG markets its directory by subscriptions, whereas the defendants market their directory by advertiser sponsorships. Proximity of the marketing channels as to distribution does not exist.

Both OAG and the defendants, however, have used direct mailings to solicit advertisers and listers. On the defendants' listing forms and on the letters to the advertisers, defendants use only the logo "The Travel Planner." Even though defendants send promotional or cover letters explaining that "The Travel Planner" is created especially for the overseas traveler to the United States, the marketing channels are the same. Defendants' logos do not state that "The Travel Planner" is published by Ashbyweb or Churchfield or distinguish its name. The additional information sent to advertisers mitigates a likelihood of confusion but the marketing channels used by both parties are similar.

### 5. Type of goods and the degree of care likely to be exercised by the purchaser

The parties' goods are designed for agents and frequent travelers. The advertisers, the purchasers at issue here, are established and sophisticated travel and hospitality businesses. These customers will decide on placement only after careful consideration of the type of publication, plaintiffs' audience and cost factors. Advertisements are costly, depending on the size of the advertisement as well as the publication. Great care is taken to assure that the advertisements state the accurate information and are placed in the correct directory. It is not likely that travel establishments placing such an advertisement would confuse publications.

Travel establishments exercise a lower standard of care when they return listing forms. The cost of listings in the travel

directories are either nominal or free of charge. Even though the listing forms are not revenue producers, they are vital to publishing the parties' goods. Accurate listings have enhanced OAG's reputation. The travel industry recognizes OAG as a publisher of an accurate and high quality travel planner. As demonstrated by OAG, travel establishments may return a listing form to the wrong publisher. Misdirected listings, which demonstrate a low standard of care in returning the forms to the appropriate publisher, weigh in favor of finding an infringement.

#### 6. Evidence of Actual Confusion

"Evidence of actual confusion is persuasive proof that future confusion is likely." *Nutri/System*, 809 F.2d at 606 (citing *AMF, Inc.*, 599 F.2d at 352.) OAG bases its contention of actual confusion on its receipt of seven listing forms sent to defendants. The evidence, however, established that within the relevant period OAG mailed approximately 600,000 listing forms to travel and hospitality services while defendants mailed 80,000 listing forms. Seven or eight misdirected listing forms is de minimis and does not establish actual confusion. *Nutri/System*, 809 F.2d at 606. Defendants also received listing forms from different companies. Anne–Lise Fleisher testified that she believed that the forms from other companies could have been intended for her use and used for the convenience of the sender. These misdirected forms are not persuasive evidence of actual confusion.

OAG did not demonstrate lost sales from advertisements placed in defendants' publication. Personnel from travel agents, travel bureaus and advertisers testified also that they have not confused defendants' and plaintiff's publications. Evidence of actual confusion is, at best, weak. Persuasive proof of actual confusion does not exist to establish a likelihood of confusion.

#### 7. Defendants' intent in soliciting the mark

"When the alleged infringer knowingly adopts a mark similar to another's, the ...

courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *AMF, Inc.*, 599 F.2d at 354. Defendants knew about OAG and had known of its excellent reputation in the field of travel directories. OAG did not prove, however, that defendants decided on its name in order to adopt a logo similar to OAG's mark. The Fleishers testified that they began publishing their travel planner because a demand for a directory of American accommodations used by European visitors existed. OAG failed to establish that defendants entered the field in order to deceive the public by causing confusion between its name and OAG's. *See Nutri/System, Inc.*, 809 F.2d at 606.

#### 8. Likelihood of Expansion

A strong possibility that either party may expand his business to compete with the other weighs in favor of a finding of infringement. *AMF, Inc.*, 599 F.2d at 354. "When goods are closely related, any expansion is likely to result in direct competition." *Id.* OAG currently distributes approximately one percent of its North American Edition in Europe. OAG did not prove that it intends to expand its subscriptions in the European market, but it has attempted to distribute its directory through the United States Travel and Tourist Agency ("USTTA") in Europe. Although OAG's directory is designed for American users, it could be sold in Europe if marketed properly.

Defendants currently are not publishing their directory but intend to resume business when this matter is decided. They have not indicated that they intend to market their directory in the United States. Once defendants resume business, their publication will be related, but it still will not be in direct competition with OAG. Expansion of either parties' business is not likely and thus does not weigh in favor of finding an infringement.

■ Based on the foregoing, I find that plaintiffs have proven a likelihood of confusion between defendants' logo "The Travel Planner" and OAG's mark "OAG Travel Planner," but that such does not exist be-

tween "The Travel Planner USA" or "USA Travel Planner" and OAG's mark. Defendants, thus, have infringed OAG's mark only to the extent of using the term "The Travel Planner," standing alone.

## C. Laches

■ Defendants assert an affirmative defense of estoppel by laches. "Laches can bar recovery in trademark or trade name actions where injunctive relief is sought." *E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir.1983). Defendants have the burden to prove that OAG knew of defendants, that OAG unreasonably delayed in filing suit and that they caused prejudice to the defendants. *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 515 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989). To prove that OAG knew of defendants' publication, OAG must "at least make a showing that it would have been inconceivable that the party charged with laches would have been unaware of the use of the mark." *Georgia–Pacific v. Great Plains Bag Co.*, 614 F.2d 757, 759 (C.C.P.A. 1980). Defendants contend that in at least four incidents prior to 1987, OAG knew that they published "The Travel Planner."

Defendants contend that OAG knew of defendants' publication when defendants made inquiries into whether OAG would sponsor defendants' publications. However, when Fleisher inquired, defendants were not using the logos in question. OAG could not have known of a possible trademark infringement at that time.

■ Defendants contend that OAG knew of them in 1983 when defendants placed an advertisement in a trade show newsletter which was sponsored by the Magazine Travel Division of OAG. Executives from OAG's publishing and advertising departments, who were charged with protecting OAG's trademark, were not present at the trade shows. Defendants have not demonstrated that the Magazine Travel Division should have had a duty to report any potential infringement. *See Georgia–Pacific Corp.*, 614 F.2d at 763 (*citing Dawn Donut Company v. Hart's Ford Stores, Inc.*, 267

F.2d 358, 363 (2nd Cir.1959)). Since a separate department from the publishing or advertising departments sponsored the newsletter and the Magazine Travel Division's duties are not of the type that would require sensitivity to its trade mark, it was reasonable that OAG did not file suit at that time. *See Id.*

Defendants next contend that OAG should have known about their publication when Brian Kirby obtained a copy of the 1985 edition of "Travel Planner USA." Tony Clarke, Kirby's supervisor in London, and Kirby both reviewed a copy of "The Travel Planner USA" and did not immediately send it to OAG's office in Illinois. Kirby could not remember how much time had lapsed before he sent defendants' directory to OAG's main office. Kirby testified that he sent "The Travel Planner USA" to Marge Nester, the publications manager at the Illinois Office, but Nester testified that she did not recall receiving it.

Finally, it was shown that in 1984 Marge Nester returned defendants' misdirected listing forms to Fleisher. Nester was held responsible to protecting OAG's mark and she did not inform the legal department regarding the first misdirected listing forms. In 1987 OAG charged Nester with reviewing other publications to guard against infringements and requested the London Office to forward any guides that used the term "travel planner" as a logo. OAG filed this action in 1987 after it received seven additional misdirected forms.

■ The earliest OAG can be held to know of defendants' publication is 1984 when Marge Nester returned defendants' listing forms. A variety of factors are weighed to determine if a delay was unreasonable and if laches should bar injunctive relief in a trademark action: 1) the strength and value of OAG's trademark; 2) OAG's diligence in enforcing its mark; 3) the harm to OAG if relief is denied; 4) whether defendants acted in good faith ignorance of OAG's rights; 5) competition between OAG and defendants; and 6) harm suffered by defendants because of OAG's delay. *Clamp Mfg. Co.*, 870 F.2d at 515.

The testimony is insufficient to establish that OAG unreasonably delayed in filing an action. First, OAG has a strong mark and has acquired a reputation over the years. Second, OAG was diligent in enforcing its mark by obtaining registered trademarks, by waiting to take action until after OAG learned of the misdirected listing forms, and by sending a demand letter to cease and desist from using the term "travel planner" prior to filing this suit. Third, it is not clear whether defendants acted in good faith ignorance of OAG's mark. Van Fleisher testified that he knew about OAG for twenty years and adopted a name similar to OAG's name. Fourth, the parties' publications are not directly in competition but are substantially related. Lastly, even though OAG has not demonstrated that it has been harmed by the defendants' use of the term "The Travel Planner," defendants have not demonstrated that they were harmed by OAG's delay. If defendants were harmed by this action, it was caused by the litigation and not by a delay in the filing.

Considering the time and expense of litigation, it was reasonable for OAG to wait three years until it received the seven misdirected listing forms, concluding that the forms were some evidence of actual confusion. Plaintiff acted reasonably and is not barred by laches.

### D. *Remedy*

An injunction may be sought to enjoin future violations that are likely to occur. *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1022 (9th Cir. 1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). Since defendants have asserted that they intend to resume their business using the same logos, future violations are likely to occur. Defendants are enjoined from using the term "The Travel Planner" on their listing forms, on their letterhead, within the directory and in any way in which the term is not used in conjunction with the words USA, or Ashbyweb, or Churchfield.

### III. Dissemination of Materials Containing False Description and Representation as to the Nature of Defendants' Business.

Pursuant to 15 U.S.C. § 1125(a), OAG must prove that defendants disseminated advertising and promotional material containing false and misleading descriptions and representations of fact in regard to circulation, distribution, location, nature and size of defendants' business to potential users, listers and advertisers. Plaintiff must prove also that defendants thereby benefited. "Publications of deliberately false comparative claims gives rise to a presumption of actual deception and reliance." *U–Haul International, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir.1986).

OAG contends that defendants misrepresented the amount of subscriptions; their affiliation with TWA and Hertz Corporation ("Hertz") and the location of its business. In its promotional material, defendants claimed that "The 1986 USA Travel Planner had a fully-paid distribution of 20,000." Defendant's exhibit 129. The Fleishers pointed out the 20,000 subscriptions purchased by TWA and JETWAYS. Defendants did not materially misrepresent the number of their subscriptions.

OAG next contends that defendants misled advertisers, listers and subscribers by claiming affiliation with TWA and Hertz. Defendants produced evidence establishing their legitimate business relationship with TWA and Hertz. Hertz bought an advertisement which entitled it to place its name on the cover of defendants' publication. TWA and defendants had entered a contract for TWA to sponsor defendants and to assist them in starting defendants' publication. In return for TWA's sponsorship, defendants placed TWA's name on the cover and the spine of their publication. TWA purchased a bulk of publications and distributed them to travel agents in Europe. These were legitimate business relationships, and OAG has not proved a deliberate misrepresentation.

Lastly, OAG contends that defendants misrepresented the location of its

business. A Eugene, Oregon address and phone number were listed on defendants' advertising, promotional and listing materials. Mindy's Answering Service was located at the Eugene address, and the defendants contracted with Mindy's to provide phone and mail services in the United States. Defendants and Mindy's had a legitimate business relationship. By listing Mindy's address on their forms· and letters, OAG has not proved a deliberate misrepresentation of the location or nature of its business.

Defendants also listed on their forms and letterhead a London and Paris address. Anne–Lise Fleisher testified that the Paris address was an office which provided accounting services. The London address housed various businesses in which companies shared receptionists, secretaries and office space. OAG failed to prove that defendants misrepresented their locations of business. OAG has failed to prove by a preponderance of the evidence that the defendants disseminated material containing false or misleading facts regarding the nature, location or character of its business.

## CONCLUSION

I find that OAG has proved that defendants have infringed on OAG's trademark by using the term "The Travel Planner," standing alone. OAG, however, has failed to establish that the terms "Travel Planner USA" or "USA Travel Planner" infringes on OAG's trademark or that defendants disseminated advertising or promotional materials which were misleading or misrepresentations. Defendants have failed to demonstrate that OAG fraudulently obtained its trademark registration number 1,455,261 or that this action is barred by laches. Churchfield, Ashbyweb, and Ann–Lise Fleisher, thus, are enjoined only from using the term "The Travel Planner," standing alone and on their listing forms, on their letterhead, within the directory and in any way in which the term is not used in conjunction with the words USA, Ashbyweb, or Churchfield. Defendants, however, are not enjoined from using the terms "USA Travel Planner" or "The Travel Planner USA."

## ON MOTION TO DISMISS COUNTERCLAIMS

The matter before the court is Official Airlines Guide's ("OAG") motion (# 251) to dismiss Ashbyweb's, Annie–Lise Fleisher's, and Churchfield Publication's (herein referred to as Ashbyweb) first counterclaim and motion for summary judgment with respect to Ashbyweb's second counterclaim and in the alternative motion to dismiss the second counterclaim. Ashbyweb's motion (# 253) to strike OAG's supplemental affidavits and memorandum is granted and deny OAG's motion to file a post-trial memorandum (# 259).

### A. Motion to dismiss first counterclaim

■ OAG asserts that the first counterclaim, which is now a post trial motion for sanctions, should be dismissed because it is premature. Ashbyweb asserts that it is entitled to sanctions because OAG wrongfully obtained a temporary restraining order against Ashbyweb without giving notice, thereby causing damages to Ashbyweb. OAG contends that this matter is premature because it is dependant upon the outcome of the appeal. I find that the matter is not premature and should not be dismissed. Following the jury trial on Ashbyweb's second counterclaim, the court shall hear Ashbyweb's motion and consider the issues of whether or not OAG could have and should have given Ashbyweb notice of the hearing on the temporary restraining order and whether or not Ashbyweb suffered damages.

### B. Motion to dismiss second counterclaim

■ OAG next moves to dismiss Ashbyweb's second counterclaim for intentional interference with business relations, asserting that the counterclaim is based on an abuse of process claim and is premature. Ashbyweb primarily alleges that OAG interfered with Ashbyweb's business relations with the United States Trade and Tourism Agency ("USTTA"). Ashbyweb

intends to prove that OAG had an improper motive by introducing evidence that OAG obtained the TRO without notice, that OAG filed this action for oppressive reasons, and that OAG attempted to interfere with its business relations with Mindy's Answering Service. Ashbyweb's counterclaim is not a claim for abuse of process and does not primarily arise out of this litigation. Thus, it is not premature.

■ OAG also contends that Ashbyweb's second counterclaim should be dismissed pursuant to *forum non conveniens.* Ashbyweb argues that the counterclaim should not be dismissed because it is a compulsory counterclaim, pursuant to Federal Rules of Civil Procedure 13(a). Ashbyweb also argues that because OAG choose the forum, it cannot now assert *forum non conveniens.*

A compulsory counterclaim is "one that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require presence of third parties of whom the court cannot acquire jurisdiction." Fed.R.Civ.Pro. 13(a). In finding that Ashbyweb's counterclaim is compulsory, sufficient operative facts exist in Ashbyweb's second counterclaim which are similar to the facts OAG asserted in its claim for trademark infringement and dissemination of false and misleading promotional materials.

■ Even if this court found that the counterclaim is not compulsory, the district court has broad discretion to dismiss a case based on *forum non conveniens. Cheng v. Boeing Co.,* 708 F.2d 1406, 1409–1410 (9th Cir.1983). After considering the private and public factors, I find that this action does not warrant dismissal. *Id.*

One factor I considered in determining whether this action should be dismissed was which forum's law this court must apply. *Id.* Because this action primarily arose in England, English law could apply. Where there is an issue regarding the choice of law, this court applies Oregon law to determine which law to apply to a particular case. *See Klaxon Co. v. Stentor Elec. Mfg., Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Oregon courts hold that if there is no apparent conflict between the relevant principal of foreign law and Oregon's law, the court is free to apply the law of the forum. *Deerfield Commodities, Ltd v. Nerco, Inc.,* 72 Or.App. 305, 317, 696 P.2d 1096 (1985); *Western Helicopter Services v. Rogerson Aircraft,* 728 F.Supp. 1506, 1510 (D.Or.1990). In regards to the common law tort of intentional interference with business relations, the law of the state of Oregon does not differ from the law of England. *See Lonhro Plc. v. Fayed,* 1989 2AllER 65; *Ron Tonkin Gran Turismo v. Wakehouse Motors,* 46 Or.App. 199, 208, 611 P.2d 658 (1980). Because no actual conflict exists, this court will apply Oregon law. OAG's motion to dismiss based on *forum non conveniens* and based on the action being premature is denied.

### C. *Motion for summary judgment in regards to the second counterclaim*

In regards to Ashbyweb's counterclaim for intentional interference with business relations, OAG argues that summary judgment should be granted in its favor. OAG contends that there are no genuine issues of material fact in regards to whether or not OAG knew of Ashbyweb's relationship with USTTA, OAG had an improper motive, and OAG interfered in Ashbyweb's business relationship with Mindy's Answering Service.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Service v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable party could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Special rules of construction apply to evaluate summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical,* 809 F.2d at 630.

■ Ashbyweb has the burden to prove that OAG intentionally interfered in Ashbyweb's relationship with USTTA. The elements applied to Ashbyweb's claim for the tort of an intentional interference with business relations are whether or not:

(1) Ashbyweb had certain business relations with USTTA;

(2) OAG intentionally interfered with those relations;

(3) OAG acted with an improper motive or by improper means in one or more of the ways alleged by Ashbyweb;

(4) and OAG's actions caused damage to Ashbyweb beyond the fact of interference. *See Ron Tonkin Gran Turismo v. Wakehouse Motors,* 46 Or.App. 199, 208, 611 P.2d 658 (1980). To prove that OAG intentionally interfered in Ashbyweb's business relations, Ashbyweb must prove that OAG knew of Ashbyweb's business relations with USTTA. *Willamette Quarries, Inc. v. Wodtli,* 308 Or. 406, 413, 781 P.2d 1196 (1989). OAG is not entitled to the defense of privilege if OAG used unlawful or otherwise improper means to obtain business. *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or. 201, 209, 582 P.2d 1365 (1978). "Commonly included among improper means are violence, threats, or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id.* at 210 fn. 11, 582 P.2d 1365. Actions in violation of the Sherman Act also constitute improper motive.

*Ron Tonkin Gran Turismo v. Wakehouse Motors,* 46 Or.App. 199, 208, 611 P.2d 658 (1980).

■ Genuine issues of material fact exist in regards to whether or not OAG knew of Ashbyweb's relationship with USTTA and whether or not OAG had an improper motive when Ashbyweb established a contractual relationship with USTTA. OAG also argues that OAG did not interfere with Mindy's Answering Service. Ashbyweb, however, does not assert that OAG interfered with its business relationship with Mindy's Answering Service, but alleges that OAG's attempt to interfere with its relationship with Mindy's Answering Service is evidence of OAG's improper motive. Genuine issues of material fact exist as to whether or not OAG's actions demonstrate an improper motive. OAG's motion for summary judgment is denied.

### CONCLUSION

I deny OAG's motions to dismiss and motion for summary judgment in regards to Ashbyweb's first and second counterclaims. This court shall apply the law of the state of Oregon in Ashbyweb's counterclaim for intentional interference with business relations.