THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
March 24, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Couch/Braunsdorf Affinity, Inc.*
*v.*
*12 Interactive, LLC*
_____

Cancellation No. 92051006
_____

Joshua S. Frick of Brinks Hofer Gilson & Lione for Coach/Braunsdorf Affinity, Inc.

Michael G. Kelber of Neal, Gerber & Eisenberg LLP for 12 Interactive, LLC.
_____

Before Zervas, Bergsman and Masiello, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Couch/Braunsdorf Affinity, Inc. ("petitioner") has petitioned to cancel Registration No. 3355480 for the mark PERKSPOT, in standard character form, for "administration of a program for enabling participants to obtain discounts from retailers and service providers," in Class 35.[1] The ground for cancellation is

---

[1] Issued December 18, 2007. A combined declaration of use and incontestability under Sections 8 and 15 of the Trademark Act was filed on September 10, 2013; and the Section 8 has been accepted.

likelihood of confusion. Petitioner has pleaded ownership of the three registrations set forth below.

1. Registration No. 1786961 for the mark PERKS, in typed drawing format, for "providing volume discount buying services to others," in Class 35;[2]

2. Registration No. 3210654 for the mark **Perks**, in standard character form, for "buying services, namely, providing volume discounts for consumer products and services via a magnetically encoded card," in Class 35;[3] and

3. Registration No. 2580914 for the mark PERKSCARD, in typed drawing form, for "buying services, namely, providing volume discounts for consumer products and services," in Class 35.[4]

---

[2] Issued August 10, 1993; renewed. Effective November 2, 2003, Trademark Rule 2.52, 37 C.F.R. §2.52, was amended to replace the term "typed" drawing with "standard character" drawing. A mark depicted as a typed drawing is the legal equivalent of a standard character mark.

[3] Issued February 20, 2007. This registration was cancelled on September 27, 2013 for failure to file a declaration of use under Section 8 of the Trademark Act. However, because respondent filed a counterclaim to cancel this registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1) on the ground the mark is merely descriptive and the parties litigated and briefed the issue of whether the mark **Perks** is merely descriptive, we will decide the issue.

[4] Issued June 18, 2002; renewed. Petitioner also pleaded ownership of Registration No. 3156685 for the mark **PerksCard,** in standard character form, for "buying services, namely, providing volume discounts for consumer products and services," in Class 35. However, this registration has been cancelled under Section 8 of the Trademark Act, 15 U.S.C. § 1058, for failure to file a declaration of continued use. When a Federal registration owned by a party has been made of record, and the status of the registration changes between the time it was made of record and the time the case is decided, the Board will take judicial notice of the current status of the registration, as shown by the records of the Office. *Nike Inc. v. WNBA Enterprises LLC*, 85 USPQ2d 1187, 1192 n. 6 (TTAB 2007). *See also* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 704.03(b)(1) (3d ed. 2012). Because this registration has been cancelled, we give it no further consideration.

12 Interactive, LLC ("respondent"), in its answer, denied the salient allegations in the petition for cancellation and filed a counterclaim to cancel petitioner's pleaded registrations on the ground that the marks PERKS, **Perks** and PERKSCARD are generic. Respondent alternatively counterclaimed to cancel Registration No. 3210654 for the mark **Perks** on the ground that it is merely descriptive.

Petitioner, in its answer, denied the salient allegations in respondent's counterclaims for cancellation.

## I.     Preliminary Issue

During the trial, petitioner improperly designated testimony and exhibits as "Confidential." For example, the entire testimony depositions of respondent's President Christopher Hill and respondent's former Vice President of Business Development and Marketing Branden Smythe were designated as confidential.[5] One example of such improper designation is Exhibit No. 58 to the Hill deposition, a two-page document describing respondent's services that is distributed to prospective customers.[6] It is inconceivable that marketing materials distributed to respondent's purchasers and potential purchasers could be confidential documents. To that end, we note that the marketing materials do not contain a warning or legend advising the purchasers or potential purchasers that the marketing materials contain trade secrets and should be kept confidential.

---

[5] Petitioner took the depositions of these individuals during its testimony period.

[6] Hill Dep., p. 44.

3

Other examples of improperly designated testimony are Exhibits 2 and 3 of the testimony deposition of Robert Dow, petitioner's President. Exhibit 2 is a "presentation that we use when talking to prospective clients describing the entire Perks program." The document is "directed towards typically employer groups, associations, hospitals, schools that are interested in the Perks program."[7] Exhibit 3 is for a similar presentation:

> This is a presentation that we use when educating employees or clients on the different things that they're able to do. It also gives them some highlights of our program. There's actual descriptions of how people saved money. So these are real life situations. It shows them the different ways to save, so the in-store discounts, the on-line and printable coupons.[8]

Because of the improper designation of testimony and evidence as confidential by petitioner, it is not clear to us what evidence is intended to be treated as truly "Confidential" or "Confidential Attorney's Eyes Only." Board proceedings are designed to be transparent to the public and the contents of proceeding files publicly available. The improper designation of materials as confidential thwarts that intention. Moreover, it is more difficult to make findings of fact, apply the facts to the law, and write decisions that make sense when the facts may not be discussed. The Board needs to be able to discuss the evidence of record, unless there is an overriding need for confidentiality, so that the parties and a reviewing court will know the basis of the Board's decision. Therefore, in rendering our decision, we will not be bound by petitioner's designations and in this

---

[7] Dow Dep., pp. 15-16.

[8] Dow Dep. p. 26.

opinion, we will treat only testimony and evidence that is clearly of a private nature or commercially sensitive as confidential.

## II.    The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), files of the registrations at issue.  In addition, the parties introduced the following testimony and evidence:

A.    Petitioner's testimony and evidence.

1.    The testimony deposition of Robert Dow, petitioner's president, with attached exhibits;

2.    The testimony deposition of Christopher Hill, respondent's Chief Executive Officer and co-founder, with attached exhibits;

3.    The testimony deposition of Branden Smythe, respondent's former Vice President of Business Development and Sales and co-founder, with attached exhibits;

4.    Notice of reliance on the following items from the Internet pursuant to *Safer Inc. v. OMS Investments Inc.* 94 USPQ2d 1031, 1039 (TTAB 2010): [9]

    a.    Printout from petitioner's website; and

    b.    News articles and press releases appearing on the Internet;

---

[9] Documents obtained from internet may be admitted into evidence in *inter partes* proceeding before Trademark Trial and Appeal Board pursuant to notice of reliance in same manner as printed publication in general circulation, in accordance with 37 C.F.R. §2.122(e), provided document identifies date of publication or date accessed and printed, as well as its source. *Safer Inc. v. OMS Investments Inc.*, 94 USPQ2d at 1039.

5.   Notice of reliance on the following items:

a.   Copies of petitioner's pleaded registrations prepared by the U.S. Patent and Trademark Office showing the current status of and title to the registrations; and

b.   Copies of notices of opposition and Board orders in other proceedings purportedly to show petitioner's enforcement efforts;

6.   Notice of reliance on respondent's responses to petitioner's first set of Interrogatories Nos. 1, 2, 3, 11, 12, and 13; and

7.   Notice of reliance on consent judgment between petitioner's predecessor-in-interest and a third party purportedly to show petitioner's enforcement efforts.

B.   Respondent's evidence.

1.   Notice of reliance on the following items:

a.   Documents from the Internet pursuant to *Safer Inc. v. OMS Investments Inc.*, 94 USPQ2d at 1039;[10]

b.   Copies of third-party registrations containing the word "Perks";

---

[10] The evidence includes a list of the Internet search results from the Yahoo! search engine for the word "Perks."  An Internet search engine "hit list" generally has little probative value, because such a list does not show sufficient context in which the term is used on the listed web pages. *See In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) (deeming Google® search results that provided very little context of the use of ASPIRINA to be "of little value in assessing the consumer public perception of the ASPIRINA mark"); *In re Tea and Sympathy, Inc.*, 88 USPQ2d 1062, 1064 n.3 (TTAB 2008) (finding truncated Google® search results entitled to little probative weight without additional evidence of how the searched term is used); *In re Thomas*, 79 USPQ2d 1021, 1026 (TTAB 2006) (rejecting an applicant's attempt to show weakness of a term in a mark through citation to a large number of Google® "hits" because the "hits" lacked sufficient context).  The better practice is to attach copies of a reasonable number of representative website pages that show how the term is actually used.  Nevertheless, we have considered the hit list to the extent that we can glean from it any evidence of value.

and

    c.      Dictionary definitions of the word "Perks."

### III.    <u>Whether Petitioner's Marks PERKS and PERKSCARD Are Generic</u>?

We first address respondent's counterclaim to cancel petitioner's pleaded registrations.

### A.    <u>Standing</u>.

Respondent has standing based on petitioner's assertion of its registrations against respondent in its petition to cancel respondent's registration. *See Ohio State University v. Ohio University*, 51 USPQ2d 1289, 1293 (TTAB 1999) ("[A]pplicant's standing to assert the counterclaim arises from applicant's position as a defendant in the opposition and cancellation initiated by opposer").

### B.    <u>Genericness</u>.

It is respondent's burden to establish that PERKS, **Perks** and PERKSCARD are generic by a preponderance of the evidence. *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1554 (Fed. Cir. 1991) ("Magic Wand had the burden to show by a preponderance of the evidence that the primary significance of the TOUCHLESS mark to the relevant public is the automobile washing service itself, rather than a washing service provided by a particular entity.").[11]

---

[11] We also note that one seeking to cancel a registration must rebut the presumption that the registration is valid by a preponderance of the evidence. *Dan Robbins & Associates, Inc. v. Questor Corporation,* 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979).

There is a two-part test used to determine whether a designation is generic: (1) what is the genus of goods or services at issue? and (2) does the relevant public understand the designation primarily to refer to that genus of goods or services. *H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986). The public's perception is the primary consideration in determining whether a term is generic. *Loglan Inst. Inc. v. Logical Language Group Inc.*, 902 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992). Evidence of the public's understanding of a term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *Loglan Inst.* 22 USPQ2d at 1533; *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979).

1. <u>The genus of the services at issue</u>.

The specific category of services is volume discount buying services. *Magic Wand Inc. v. RDB Inc.*, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of services set forth in the certificate of registration."). *See also In re Trek 2000 Int'l Ltd.,* 97 USPQ2d 1106, 1112 (TTAB 2010) ("the genus of goods at issue in this case is adequately defined by applicant's identification of goods…").

Opposer described its volume discount buying services as follows:

> We design programs for employees or members to help them save money on things they use every day. …
>
> We negotiate discounts on their behalf at small to medium sized businesses. So if they are looking to get their oil changed or go out to dinner, rent a video, buy a car, they can go in as a Perks member and get a discount. We also have nationally recognized brands as well that they can take advantage of discounts. So whether they're

> going to the movies or they're shopping at Home Depot, they can get additional discounts as well. …
>
> The PerksCard is used to identify them at the local businesses when they shop so that the business owner knows that they are a PerksCard member and they can get a discount.[12]

*See also* Dow Deposition Exhibit 2, providing the following description of the services in a presentation used to describe the PERKS program:

> Discount networks providing lifestyle savings for employees, members and other consumer groups, savings from local merchants, featured partners and online mall [sic].

2.  <u>The relevant public.</u>

The second part of the genericness test is whether the relevant public understands the designation primarily to refer to that class of goods.  The relevant public for a genericness determination is the purchasing or consuming public for the identified services.  *Magic Wand Inc. v. RDB Inc.,* 19 USPQ2d at 1553, *citing In re Montrachet S.A.,* 878 F.2d 375, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989); *In re Merrill Lynch, Pierce, Fenner, & Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); *H. Marvin Ginn Corp. v. International Ass'n of Fire Chiefs, Inc.,* 228 USPQ at 530; *Dan Robbins & Assocs., Inc. v. Questor Corp.,* 202 USPQ at  105 (CCPA 1979).  The relevant public comprises companies that purchase a volume discount buying service for customers and employees as well as individuals who join organizations offering volume discount buying services.  *See* Dow Deposition, p. 12 ("We design programs for employees or members to help them save money on things

---

[12] Dow Dep., pp. 12-13.

they use every day. We also do benefits for any group, typically the size of 500 more [sic] employees or members.");[13] and respondent's notice of reliance on Internet websites (*e.g.,* "Borders Rewards Perks Existing Users" with "Exclusive discounts at hundreds of retailers for free"; Mommyperks.com provides access to a "wide variety of friendly businesses that offer you Perks and discounts"; and Denver Post Perks "designed to offer exclusive values from our advertisers just for you.").

Contrary to petitioner's arguments, the relevant public is not limited to "professionals in corporate human resources, personnel or employee activities departments"[14] because petitioner's pleaded registrations are not limited to any particular channels of trade or classes of consumers. The question of registrability must be determined, in proceedings before the Board, on the basis of the services as set forth in the registrations, rather than in reference to the precise nature of the services on or in connection with which the marks are actually used or intended to be used. *See Octocom Systems Inc. v. Houston Computers Services Inc.,* 918 F.2d 937, 16 USPQ2d 1783, 1787-88 (Fed. Cir. 1990); *In re Allen Electric and Equipment Co.,* 458 F.2d 1404, 173 USPQ 689, 690 (CCPA 1972); and *In re Vehicle Information Network Inc.,* 32 USPQ2d 1542, 1544 (TTAB 1994). As noted above, petitioner's services are "providing volume discount buying services to others," "providing

---

[13] *See also* Smythe Dep., pp. 17-18 (respondent was formed "to be an outsource solution for corporations, employers to provide discounts and perks to employees") and pp. 20-21 (the business brings "valuable perks and discounts to employees while reducing the burden of administration for large corporations" and "the employee realizes that it's a voluntary benefit.").

[14] Petitioner's Combined Reply Brief as Plaintiff in the Cancellation and Defendant in the Counterclaim, p. 5.

volume discounts for consumer products and services via a magnetically encoded card," and "buying services, namely, providing volume discounts for consumer products and services." Thus, the relevant purchasers are companies that purchase volume discount buying service for customers and employees as well as individuals who join organizations offering volume discount buying services.

3.  Public perception.

To determine how the relevant purchasers understand the meaning of the terms PERKS, **Perks** and PERKSCARD in the registrations sought to be canceled, we have considered dictionary definitions, the petitioner's use of "Perks" and "PerksCard," respondent's use of the word "Perks," and third-party use of the word "Perks," including third-party registrations.

a.  Dictionary definitions.

A "perk" is defined, *inter alia,* as "perquisite."[15]  A "perquisite" is defined as "an incidental payment, benefit, or privilege over and above regular income or salary."[16]

According to BusinessDictionary.com, "perks" is defined as follows:[17]

---

[15] Respondent's notice of reliance on the following dictionary definitions:  **RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY**, p. 986 (2001).  *See also* **THE AMERICAN HERITAGE COLLEGE DICTIONARY**, p. 1036 (4th ed. 2002), **MERRIAM-WEBSTER'S DESK DICTIONARY**, p. 406 (1995), **WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY**, p. 876 (1987).

[16] Respondent's notice of reliance on the following dictionary definitions:  **RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY**, p. 987. *See also* **THE AMERICAN HERITAGE COLLEGE DICTIONARY**, p. 1038,  **MERRIAM-WEBSTER'S DESK DICTIONARY**, p. 407, **WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY**, p. 877.

[17] Respondent's notice of reliance on documents from the Internet.

> Informal word for perquisites which are privileges granted to employees in addition to their salaries and benefits (such as medial [sic] and pension plans). "True" perks have little or no cash value or tax implications and may include company car, vacations, reserved parking space, spacious office, private dining and washroom facilities, etc.

*See also* the *Wikipedia* entry defining "perks" as "an employee benefit, colloquially known as a 'perk' or a "perq", a short form of the word perquisite."[18]

> b.      Petitioner's use of the word "Perks" and the term PerksCard.

Petitioner submitted the advertisement shown below as a specimen supporting its use of **Perks** (Registration No. 3210654).



Petitioner submitted the following specimen to demonstrate its use of the mark PERKSCARD (Registration No. 2580914) when petitioner filed its Section 8 declaration of continued use.

---

[18] *Id.*



Petitioner identified the PERKSCARD program in its marketing materials as shown below.[19]

*What is PerksCard?*

● The PerksCard® program is a lifestyle product and service discount and savings program enabling industry leaders to attract and retain their employees, members and customers.

● PerksCard provides individuals with exclusive access to both local and national discounts on products and services they use every day in their communities and online. Our ability to tailor this program to your needs and handle all administration is unsurpassed.

The same marketing piece provides the following *PerksCard Overview*.

● Cardholders receive offers and access through direct PerksCard Relationships with:

1. **Local Merchants** …

2. **Featured Partners** …

3. **Online Mall** …

---

[19] Dow Dep., Exhibit 2.

13

4. ***Insurance & Benefits*** …

● Proven platform and model to support employee morale efforts and to increase the value of association membership

\* \* \*

● Platform includes certain customization features

"Employees or members simply need to show their PerksCard to receive their discount."[20]

Petitioner sold its volume discount buying services to Burke Healthcare and co-branded the PERKSCARD.[21] Petitioner sent the following letter to the Burke Healthcare employees:

> Dear Employee:
>
> We are excited to announce the Burke Perks Program:  As a Burke PerksCard member the PerksCard is an exclusive benefit that will help you save both time and money on many of your everyday purchases.[22]

Petitioner created "a marketing piece … to educate potential clients and customers on the PerksCard program.  It describes exactly who we are and what we do."[23]  The "marketing piece" displays a photograph of a PerksCard that has the following text:

> PerksCard
> Your one and only card for savings …

---

[20] Id.

[21] Dow Dep., p. 44.

[22] Dow Dep., Exhibit 11.  This is only the first paragraph of the letter.  It is representative of letters sent to the employees of other businesses that retain petitioner for its volume discount buying services.

[23] Dow Dep., p. 56.

14

> Shopping in Your
> Neighborhood Now
> Has More Perks![24]

*See also* Dow Deposition Exhibit 21, a "presentation or press kit folder that was mailed out to potential clients or customers, and it described, again, the Perks program and all the different benefits of the Perks program."[25] The press kit stated, "Your greatest asset is your people," "Shopping now has more perks," "Excellent recruiting tool," and "Use in conjunction with: Benefits Programs, Promotions."

Dow Deposition Exhibit 22 is an insert "that would go into a press kit folder describing … how much somebody could save with the Perks program, how they could get access to the Perks program, how to get in contact with us about the Perks program, and also described different ways we could co-brand the PerksCard program for them and their members or employees."[26] This insert has a page with the following information:

> YOUR GREATEST ASSET IS YOUR PEOPLE
> CUSTOM BUILT
> AROUND YOUR ASSOCIATION
>
> &ast;  &ast;  &ast;
>
> Perks Group integrates a network of Local and National vendors offering customized discounts and promotions along with the ability to add key benefit programs. The PerksCard allows your organization to have all the tools you need in one easy-to-use platform.
>
> &ast;  &ast;  &ast;

---

[24] Dow Dep., Exhibit 18. *See also* Dow Exhibit 23.

[25] Dow Dep., p. 60.

[26] Dow Dep., p. 62.

> Retain and Attract Constituents

> \* \* \*

> Build Loyalty

> Provide Strong Value To Your People

> \* \* \*

> Use in Conjunction with:

● Benefit Programs

Dow Exhibit 30 is "an example of the Perk of the Month e-mail that goes out to our members, clients, and their employees."[27] It features the PerksCard Network logo on the top. Below the logo is the statement "Perks of the Month – Both National and Local Discounts."

Dow Deposition Exhibit 43 consists of press releases from petitioner "announcing different things that have happened, whether it be new clients or accomplishments of our company."[28] Dow Deposition Exhibit 43 includes the following:

> 1. October 14, 2010 press release announcing that "PerksCard Network Named New York State Cooperative and Experiential Education Association Employer of the Year."
>
> \* \* \*
>
> Founded in 1988, PerksCard Network is an employee benefit savings program that human resources and benefits departments, association and other organizations can offer to their employees and members.

---

[27] Dow Dep., p. 72.

[28] Dow Dep., p. 115.

2. The Gaffney Ledger (Cherokee County, South Carolina) (May 6, 2005) – a news story reporting that state workers are getting petitioner's PerksCard discounts.

State workers get discount cards

Columbia – State workers are getting discount cards that trim their shopping bills at local and national retailers.

\* \* \*

Sam Wilkens, the director of the state Office of Human Resources, says the cards are a way of helping state workers.

3. Undated press release announcing Schwan's Global Supply Chain as a new client.

***PerksCard Network***, an Augeo Affinity Marketing company, is pleased to announce that Schwan's Global Supply Chain has become a new client. Schwan's Global Supply Chain will now provide all of their employees in the Florence, KY area with PerksCards, providing them with meaningful savings on products and services they use on a weekly or even daily basis.

"We are very excited to launch this PerksCard program and will be working on building up the merchants that will be part of the program," commented Bob Dow, President of the PerksGroup. … "We feel we have created a program that is like a hidden paycheck."

**About PerksCard Network**:

Founded in 1988, ***PerksCard Network*** is a savings and discount program that employers, associations and other organizations can offer to their employees and members.

c. Respondent's use of the word "Perks."

Though we are, at this point in this opinion, assessing the counterclaim and whether petitioner's marks are perceived as generic by the relevant public, we have

17

considered respondent's use of its PERKSPOT mark as relevant evidence also bearing on public perception of petitioner's marks. Respondent submitted the webpage displayed below as its specimen showing use of the mark PERKSPOT.



Hill Deposition Exhibit 58 is an overview of respondent's services that is distributed to prospective customers.[29] The overview provides the following information:

> PerkSpot Rewards Platform –
> A Powerful Tool for Loyalty and Retention
>
> PerkSpot offers its customized portal that acts as a single destination for the delivery, communication and management of employee perks and specialty benefits programs to employers and members. …
>
> PROVIDE PERKS AND BENEFITS
> WITH PERKSPOT'S RANGE OF OFFERINGS:
>
> ● Employee Discount Shopping Mall
>
>          *     *     *

---

[29] Hill Dep., p. 44.

- Vacation Savings Club

  *       *       *

- Home and Auto Insurance

  *       *       *

- Legal Plans

  *       *       *

- Computer Purchasing Programs

  *       *       *

- Identity Theft Solutions

  *       *       *

- Voluntary Employee Benefits

Smythe Deposition Exhibit 49 is a copy of respondent's website.

Respondent's website displays the following information:

**PerkSpot manages discount and specialty benefits programs on behalf of leading employers**

*       *       *

It's all about the perks! PerkSpot's benefits platform allows employees to save money with a benefits package they will actually enjoy putting to use.

*       *       *

**Overview**

PerkSpot is the leading provider of specialty benefit and discount programs.

*       *       *

**Job Opportunities**

Senior Developer

19

PerkSpot, a leading employee perks and loyalty company with over 1.6 million employees accessing its platform, is looking for a talented senior application developer to join our growing tech team.

\* \* \*

**Clients**

PerkSpot provides a comprehensive, flexible solution designed to address the needs of organizations seeking a robust and high ROI benefit offering.

\* \* \*

The PerkSpot platform augments the existing core benefits offering, providing employees with greater ability to stretch their payroll dollars while client organizations build 'employer of choice' reputations that attract and retain top talent.

d. Third-party use of the word "Perks."[30]

Having considered relevant dictionary definitions, and both petitioner's and respondent's uses of their respective "Perks-" formative marks as evidence bearing on likely public perception of petitioner's marks, we now consider evidence of third-party uses. The following references are a sampling of the evidence of third-party use of the term "Perks" found on the Internet and introduced by respondent through a notice of reliance.

---

[30] Respondent introduced these documents through its notice of reliance on Internet evidence. These documents are admissible only to show what has been printed, not the truth of what has been printed. *Safer Inc. v. OMS Investments, Inc.* 94 USPQ2d at 1040. We also note the mere introduction of a webpage does not tell us how many people have viewed that webpage. "A party may increase the weight we will give such website evidence by submitting testimony and proof of the extent to which a particular website has been viewed." *Id.* at 1039. In summary, the Internet documents are probative only for what they show on their face.

1. *Pittsburgh Tribune Review* (September 15, 2010) (pittsburghlive.com)

Drug company perks may sway doctors

Doctors rationalize that they can accept perks such as free dinners and trips from pharmaceutical companies as a reward for their years of hard work, according to a study published Tuesday by Carnegie Mellon University researchers.

2. *About.com*: Job Searching (jobsearch.about.com)

Benefits and Perks

Evaluating Employee Benefits and Perks

For many of us, the most important factor in considering a job offer is salary. For others, job security is of primary importance. Also high on the list of considerations are benefits and perks. When considering perks, the desire to work in a comfortable casual environment where employees can set their own work schedule, have an option to telecommute, and where there is a casual dress code, are all important.

Typical Employee Benefit Packages

*     *     *

How to Evaluate Perks

*     *     *

As you can see there is no standard list of perks that you can measure your job offer against. What you'll need to do is evaluate each offer on its merits – the salary, the benefits and the perks, and determine how those perks will benefit you.

3. *Answers.com*

Perk

Definition: benefit

U.S. Government Guide:

Perks (1992)

Elected officials enjoy many benefits of office, known as perquisites, or "perks." Members of Congress send mail free of airports [sic], and are reimbursed for trips they make to their home state and abroad. At the Capitol they have special subways, gymnasiums, shops that offer discount-price supplies, and free plants from the Botanical Gardens to decorate their offices, assigned cars and drivers.

Critics of perks argue that the people's representatives should not receive special privileges at the taxpayers' expense. …

4.    Mommy Perks (mommyperks.com)

This website is a social network for mothers. It identifies a "variety of friendly businesses that offer you Perks and discounts," as well as newsletters and business reviews.

5.    *DenverPostPerks.com*

Welcome to Denver Post Perks

An exclusive online benefit for Denver Post subscribers

Denver Post Perks offers and specials are only available to registered DenverPostPerks.com users who have an active Denver Post subscription. Now we have added even more value and money saving perks to your subscription anytime you need it even from your handheld device. Denver Post Perks is designed to offer exclusive values from our advertisers just for you.

6.    Dunkin' Donuts (dunkindonuts.com)

DDPERKS

LIFE RUNS BETTER WITH PERKS.

IT ALL STARTS WITH A FREE BEVERAGE …

22

Enroll in Dunkin' Perks® today and get a free medium beverage, plus another free medium beverage for your birthday.

You'll also enjoy:

● Exclusive in-store and online offers

● The inside scoop on new store openings, new products and more

● Special perks, just for you

7. OfficeMax (officemaxperks.com)

MaxPerks® Rewards for Business

With MaxPerks Rewards for Business, you'll get rewarded for just buying the supplies you need for your business or home office.

As a member, you'll earn a $25 reward in your MaxPerks account for every $500 you spend on qualified purchases. Plus there is no limit on how much you can earn throughout the calendar year.

Earn More Reward with MaxPerks Recycling

8. *DiningPerks.com*

What are Dining Perks®?

Dining Perks® are certificates that spend like cash in participating restaurants in and around Metro Atlanta. We have certificates with a value of $5 a piece, and $25 certificates that cost you only $12.50 each. Use up to $250 worth per table.

9. *The Washington Post* (October 20, 2009)

At rescued banks, perks keep rolling

Even as the nation's biggest financial firms were struggling and the federal government was spending hundreds of billions of dollars to save many of them, the companies as a group were boosting the perks and benefits they pay their chief executives.

The firms, accounting for more than $350 billion in federal bailout funds, increased these perks and benefits 4 percent on average last year, according to an analysis of corporate disclosures filed in recent months.

\* \* \*

In the meantime, Kenneth R. Feinberg, the Obama administration official assigned to set pay for top executives at seven of the companies receiving the most help, plans to curtail perks such as country club fees when he rules on compensation later this month, according to people familiar with the matter. Perks worth more than $25,000 are getting particular scrutiny from Feinberg.

10. Army Military News (army.mil/-news) (April 9, 2010)

Perks card program at Fort Bragg offers customer discounts.

Coupon clippers have long extolled the advantages of saving money at the cash register. Well, with one swipe of the Family and Morale, Welfare and Recreation Perks card, discounts abound for soldiers, families and authorized users.

\* \* \*

The card was the brainchild of Lori Bruschi, FMWR marketing director, said Thomas. It is designed for customers to get VIP perks and privileges.

\* \* \*

The Perks card program is new, but depending on its success, could be expanded.

e. Third-party registrations with the word "Perk."

Below is a sampling of third-party registrations on the Principal Register, without a claim of acquired distinctiveness, containing the word "Perk" introduced

24

by respondent through a notice of reliance, which we present in table form for ease of reference.[31]

| Mark | Registration No. | Services |
| --- | --- | --- |
| PERKS | 2453390 | Promoting the goods and services of others by providing an award program for frequent users of websites |
| PERQZ | 3291476 | Providing a purchase incentive reward program, namely, a program that provides discounts and related benefits to reward repeat customers for purchasing products and services |
| PerkShare | 4029941 | Administration of a program for enabling participants to obtain discounts on products and services |
| PERKS RESOURCES | 2930976 | Employee discount and incentive programs, namely, online retail services featuring discounts for employees |
| FASTperks | 3077460 | Administration of a discount program for enabling participants to obtain discounts on goods and services through the use of a membership program |
| PERKCHASE | 3590776 | An interactive web site for users to obtain coupons and discounts on goods and services provided by sponsors |
| PUMP PERKS and design | 3027901 | Administration of a discount program for enabling participants to obtain discounts on gasoline. |
| PURPLE PERKS "Perks" disclaimed | 3044733 | Administration of a discount program enabling members to obtain discounts on goods and services through the use of a discount membership card |

---

[31] Where these registrations include disclaimers, we have noted them.

| Mark | Registration No. | Services |
|---|---|---|
| | | |
| FIT:PERKS | 2785019 | Administration of a discount program for enabling participants to obtain discounts on goods and services through health club membership |
| | | |
| GEVITY PERKS "Perks" disclaimed | 3525190 | Providing and administering employee discount programs for retail goods and services for others |
| | | |
| PERKS FOR EYES | 3544943 | Administration of a discount program for enabling participants to obtain discounts on goods and services through the use of a discount membership card |
| | | |
| *partner*PERKS | 3621652 | Administration of a discount program for enabling participants to obtain discounts on goods and services through the use of a discount membership card |
| | | |
| PLUS PERKS | 3381375 | Administration of a discount program entitling participants to obtain discounts on goods and services of others through use of a member identification card |
| | | |
| CENTRAL PARK PERKS "Central Park" disclaimed | 3245852 | Administration of a discount program for enabling participants to obtain discounts on goods and services through the use of a discount membership card |
| | | |
| CARPERKS | 3236578 | Administration of a discount program for corporations for use as a value-added employee benefit, namely, a discount program enabling employee participants to obtain discount group offerings and specialized private pricing on automobiles. |

However, we note that, absent evidence of actual use, third-party registrations have little probative value because they are not evidence that the

marks are in use on a commercial scale or that the public has become familiar with them. *See Smith Bros. Mfg. Co. v. Stone Mfg. Co.,* 476 F.2d 1004, 177 USPQ 462, 463 (CCPA 1973) (the purchasing public is not aware of registrations reposing in the U.S. Patent and Trademark Office); *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.,* 98 USPQ2d 1921, 1934 (TTAB 2011). Nevertheless, these registrations have some value because they may be used in the manner of a dictionary to show that a mark or a portion of a mark is descriptive or suggestive of goods and services. *See Tektronix, Inc. v. Daktronics, Inc.,* 534 F.2d 915, 189 USPQ 693, 694-695 (CCPA 1976) ("[A]lthough third-party registrations are entitled to little weight on the question of likelihood of confusion where there is no evidence of actual use, they may be given some weight to show the meaning of a mark in the same way that dictionaries are used."); *In re J. M. Originals Inc.,* 6 USPQ2d 1393, 1394 (TTAB 1988); *In re Imperial Jade Mining, Inc.,* 193 USPQ 725, 726 (TTAB 1977).

4. Discussion – Respondent's Counterclaim v. Petitioner's Marks.

The dictionary evidence shows that a "perk" is an employee benefit in addition to salary. The evidence of third-party use shows that the term "perks" has been extended to describe not only employee benefits, but also benefits provided to a person in order to induce him into a commercial relationship (for example, as a customer or as a member of an organization) or provided as a reward in order to build loyalty among existing customers or members. Although a volume discount buying program may be offered to an employee or customer as a "perk" (just as a

company car, country club membership, or first-class seating during air travel may be offered as a "perk"), neither the term PERKS nor the term PERKSCARD is the generic name for such services. A volume discount buying program is a commercial arrangement whereby a person or entity, acting as a middleman, procures for its customers reduced prices for goods and services of others. Such a service is different in its nature from a perquisite offered to an employee or customer, and it may be offered to a customer otherwise than as compensation for employment or as an inducement for entering into some other commercial relationship. A volume discount buying service is not, by its nature, a "perk" and neither PERKS nor PERKSCARD is the generic name of such a service. In other words, while a volume buying discount buying service may be a "perk," not all volume discount buying services are "perks." Thus, we find that respondent's evidence fails to show that the relevant public understands the designations PERKS and PERKSCARD to refer primarily to volume discount buying services. In view of the foregoing, the counterclaim to cancel petitioner's two remaining pleaded registrations on the ground that they are generic is dismissed.

## IV.    <u>Whether the term "Perks" is merely descriptive?</u>

We now consider respondent's alternative counterclaim to cancel Registration No. 3210654 for the mark **Perks**, in standard character form, for "buying services, namely, providing volume discounts for consumer products and services via a magnetically encoded card," on the ground that it is merely descriptive. As indicated above in footnote No. 3, Registration No. 3210654 was cancelled for failure

to file a declaration of use in accordance with Section 8 of the Trademark Act, 15 U.S.C. § 1058. Trademark Rule 2.134(b), 37 CFR § 2.134(b), provides that in this situation "an order may be issued allowing respondent until a set time … in which to show cause why such cancellation … should not be deemed to be the equivalent of a cancellation by request of respondent without the consent of the adverse party and should not result in entry of judgment against respondent." Because the parties have litigated and briefed the issue of whether the mark is merely descriptive, we find that there is sufficient cause to decide the issue on the merits.

In analyzing whether **Perks** is merely descriptive, we note that petitioner is also the owner of Registration No. 1786961 for the mark PERKS, in typed drawing format, for "providing volume discount buying services to others." However, Registration No. 1786961 was more than five years old when petitioner filed its petition for cancellation and, therefore, it may not be cancelled by respondent on the ground that it is merely descriptive. Section 14 of the Trademark Act, 15 U.S.C. § 1064. Moreover, the registration is incontestable under the provisions of 15 U.S.C. § 1065 and, consequently, it is "conclusive evidence of the validity of the registered mark" pursuant to Trademark Act § 33(b), 15 U.S.C. §1115(b).

As explained in footnote 2 above, a mark depicted as a typed drawing is the legal equivalent of a standard character mark. Therefore, the marks **Perks** and PERKS are legal equivalents.

"Providing volume discount buying services to others," the services of petitioner's incontestable registration, is an identification broad enough to

encompass the "buying services, namely, providing volume discounts for consumer products and services via a magnetically encoded card," identified in the more recently issued registration. Therefore, the services are substantially equivalent.

Petitioner argues that the counterclaim to cancel its **Perks** registration is a collateral attack on the incontestable rights of its incontestable PERKS registration, citing *Park 'N Fly v. Dollar Park and Fly, Inc.,* 469 US 189, 224 USPQ 3127 (1985).[32] *Park 'N Fly* is not applicable because we are not entertaining the counterclaim to cancel the incontestable PERKS registration on the ground that it is merely descriptive, nor can we, because that registration, being more than five years old when the petition for cancellation was filed, is not susceptible to cancellation on this ground. 15 U.S.C. § 1064.

Nevertheless, it appears illogical to allow respondent to cancel **Perks** for "buying services, namely, providing volume discounts for consumer products and services via a magnetically encoded card" on the ground that it is merely descriptive when there is conclusive evidence in the record showing that the legally identical mark PERKS is a "valid" and incontestable mark for substantially equivalent services.[33] *See In re American Sail Training Association,* 230 USPQ 879, 880 (TTAB 1986). *Cf. Morehouse Manufacturing Corp. v. J. Strickland and Co.,* 407 F.2d 881, 160 USPQ 715, 717 (CCPA 1969) ("the opposer cannot be damaged, within the meaning of section 13 of the statute, by the issuance to the applicant of a

---

[32] Petitioner's rebuttal brief, p. 19.

[33] *See* Petitioner's Reg. No. 1786961 interpreted according to the provisions of 15 U.S.C. § 1115(b).

second registration where applicant already has an existing registration of the same mark for the same goods").

However, because the prior registration defense set forth in *Morehouse* is an equitable defense, *see O–M Bread, Inc. v. U.S. Olympic Committee*, 65 F.3d 933, 36 USPQ2d 1041, 1045 (Fed. Cir. 1995) ("The prior registration or *Morehouse* defense is an equitable defense …"), it is unavailable against a claim of mere descriptiveness. *See TBC Corp. v. Grand Prix Ltd.,* 12 USPQ2d 1311, 1313 (TTAB 1989). The reason for this policy was explained by the Board in *Southwire Co. v. Kaiser Aluminum & Chemical Corp.*, 196 USPQ 566, 573 (TTAB 1977) as follows:

> The theory underlying this principle * * * is that it is within the public interest to preclude registration of merely descriptive designations, to cancel registrations which are void ab initio because of this disability of the registered mark as of the time the application was filed, and to cancel those registrations where the registered marks have, since the time of registration, become terms of art or common description; and that this interest or concern cannot be waived by the inaction of any single person or concern, no matter how long the delay persists.

Because the prior registration defense is related to the equitable defenses of laches or acquiescence, it is unavailable in an *inter partes* proceeding predicated on mere descriptiveness of a mark. *Cf. Sunbeam Corp. v. Boukidis*, 172 USPQ 156, 157 n.3 (TTAB 1971) ("While applicant has pleaded that opposer acquiesced in the use of applicant's mark because it did not take any action against this prior registration, it is well-established that such a defense is unavailable in an opposition based on descriptiveness of a mark.").

If we find that petitioner's **Perks** registration is descriptive and order it canceled, that cancellation does not affect in any way petitioner's rights under its incontestable registration. There is nothing in *Park 'N' Fly* that entitles petitioner to have the later registration treated as if it were older than five years, when it is not. Nothing entitles petitioner to the benefits of this new, different registration, which has a different filing date (and accordingly grants petitioner a different date of constructive use) and has a different term and could, therefore, outlive the old registration. We therefore proceed to determine whether the mark **Perks** is descriptive.

A term is merely descriptive if it "immediately conveys … knowledge of the ingredients, qualities, or characteristics of the goods … with which it is used, or whether 'imagination, thought, or perception is required to reach a conclusion on the nature of the goods.'" *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1009 (Fed. Cir. 1987). Whether a particular term is merely descriptive is determined in relation to the goods or services for which registration is sought and the context in which the term is used, not in the abstract or on the basis of guesswork. *In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978); *In re Remacle*, 66 USPQ2d 1222, 1224 (TTAB 2002). This requires consideration of the context in which the mark is used or intended to be used in connection with those goods or services, and the possible significance that the mark would have to the average purchaser of the goods or services in the marketplace. *See In re Chamber of Commerce,* 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); *In re Bayer,*

488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007); *In re Abcor Dev. Corp.*, 200 USPQ at 218; *In re Venture Lending Assocs.*, 226 USPQ 285, 286 (TTAB 1985). The question is not whether someone presented only with the mark could guess the activities listed in the recitation of services. Rather, the question is whether someone who knows what the activities are will understand the mark to convey information about them. *DuoProSS Meditech Corp. v. Inviro Medical Devices, Ltd.*, 695 F.3d 1247, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012); *In re Tower Tech, Inc.*, 64 USPQ2d 1314, 1316-1317 (TTAB 2002).

As indicated above, the dictionary evidence shows that a "perk" is an employee benefit in addition to salary. This definition has been adopted by businesses that have registered the term "perks" as part of their marks. Also, the third-party registrations show that the term "perks" is recognized as a benefit when used in connection with the administration of a discount program for obtaining discounts for the purchase of goods and services. *In re J. M. Originals Inc.*, 6 USPQ2d at 1394 (third-party registrations listed are relevant to show how language is used). This finding of fact is corroborated by the use of the term "perks" by petitioner, respondent and third parties previously discussed above and noted below for emphasis.

Petitioner advertises its services as shown in the following examples:

1. Petitioner's specimen supporting its use of PERKS (Registration No. 3210654) states that "Shopping In Your Neighborhood Now Has More Perks!"

2.    Petitioner's form letter sent to the employees of business partners describes its services as "an exclusive benefit."

> Dear Employee:
>
> We are excited to announce the Burke Perks Program:  As a Burke PerksCard member the PerksCard is an exclusive benefit that will help you save both time and money on many of your everyday purchases.

3.    In its press releases, petitioner identifies itself as a provider of employee benefits.

> Founded in 1988, PerksCard Network is an employee benefit savings program that human resources and benefits departments, associations and other organizations can offer to their employees and members.

Respondent also advertises its PerkSpot "administration of a program for enabling participants to obtain discounts from retailers and service providers" as featuring a "perk."  As noted above, respondent's specimen of use touts the fact that "We are your 'Perks Department,'" "Perks Management," and "Its [sic] all about the perks!"

The third-party uses of the word "Perks," including use as part of a trademark in connection with loyalty programs, show that consumers perceive perks as encompassing a wide variety of benefits, including discounts.  For example,

1.    OfficeMax (officemaxperks.com)

> MaxPerks® Rewards for Business
>
> With MaxPerks Rewards for Business, you'll get rewarded for just buying the supplies you need for your business or home office.

2. DiningPerks.com

What are Dining Perks®?

Dining Perks® are certificates that spend like cash in participating restaurants in and around Metro Atlanta. We have certificates with a value of $5 a piece, and $25 certificates that cost you only $12.50 each. Use up to $250 worth per table.

3. DenverPostPerks.com

Welcome to Denver Post Perks

An exclusive online benefit for Denver Post subscribers

Denver Post Perks offers and specials are only available to registered DenverPostPerks.com users who have an active Denver Post subscription. Now we have added even more value and money saving perks to your subscription anytime you need it even from your handheld device. Denver Post Perks is designed to offer exclusive values from our advertisers just for you.

The evidence shows that petitioner administers employee benefit programs as a component of its volume discount buying service. Petitioner has described its service as having the purpose of "enabling industry leaders to attract and retain their employees, members and customers" and has offered to perform the administration of the employee benefit program as part of its service: "Our ability to… handle all administration is unsurpassed."[34] As part of providing its service, petitioner has had direct contact with its customers' employees, to whom it described its service as "an exclusive benefit that will help you save both time and money…."[35] Petitioner's PERKS program press kit urged potential customers to

---

[34] PERKSCARD program marketing materials, Dow Dep., Exhibit 2.

[35] Letter to Burke Healthcare employees, Dow Dep., Exhibit 11.

"Use [the PERKS program] in conjunction with: Benefits Programs…."[36]  Petitioner has described its service as "an employee benefit savings program"[37] and "a savings and discount program that employers, associations and other organizations can offer to their employees and members."[38]  Based on the foregoing, we find that the term "Perks" directly conveys information concerning a characteristic of the service: that is, petitioner's discount volume buying services are administered as "perks" programs, are marketed to employers as "perks" to be passed on to employees, and are promoted to employees as "perks" of employment.  Accordingly, the mark **Perks** for "buying services, namely, providing volume discounts for consumer products and services via a magnetically encoded card" is merely descriptive, and judgment is entered in respondent's favor on this counterclaim.[39]

### V.    Likelihood of Confusion

Having granted respondent's counterclaim as to one of petitioner's three pleaded registrations, we now consider petitioner's claim of likelihood of confusion as based on the other two registrations.

A.    Standing.

Because petitioner has properly made its pleaded registrations of record, petitioner has established its standing, *Cunningham v. Laser Golf Corp.,* 222 F.3d

---

[36] Dow Dep., Exhibit 21.

[37] Press release of October 14, 2010, Dow Dep., Exhibit 43.

[38] Undated press release announcing Schwan's Global Supply Chain as new client, Dow Dep., Exhibit 43.

[39] Petitioner did not plead or argue in the alternative that its **Perks** mark has acquired distinctiveness and, therefore, we have not considered whether it is registrable under the provisions of Section 2(f) of the Trademark Act.

943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

B.      Priority.

In a cancellation proceeding such as this one where both parties own registrations, priority is in issue. *Brewski Beer Co. v. Brewski Brothers Inc.*, 47 USPQ2d 1281, 1283-84 (TTAB 1998).

Petitioner's Registration No. 1786961 for the mark PERKS for "providing volume discount buying services to others" was registered on August 10, 1993 based on an application filed on November 16, 1990. Petitioner's Registration No. 2580914 for the mark PERKSCARD "buying services, namely, providing volume discounts for consumer products and services" was registered on June 18, 2002 based on an application filed on May 17, 2000. Robert Dow, petitioner's president, testified that petitioner began using the PERKS mark in 1988 and the PERKSCARD mark in 1997.[40]

Respondent's Registration No. 3355480 for the mark PERKSPOT was registered on December 19, 2007, based on an application filed on March 28, 2007. Christopher Hill, respondent's Chief Executive Officer and co-founder, testified that respondent first used the PERKSPOT mark in August 2006.[41]

---

[40] Dow Dep., pp. 28-29.

[41] Hill Dep., pp. 30-31. *See also* Smythe Dep., p. 11, identifying June 2006 as the date of first use.

In view of the foregoing, we find that petitioner has established priority of use for the marks PERKS and PERKSCARD for the services set forth in the registrations.

C.    *du Pont* Analysis.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks"). These factors, and any other relevant *du Pont* factors in the proceeding now before us, will be considered in this decision, involving comparison of petitioner's incontestable registration for PERKS, its registration for PERKSCARD, and respondent's registration for PERKSPOT.

1.    The similarity or dissimilarity and nature of the services, the established likely-to-continue channels of trade and classes of consumers.

The recitation of services in respondent's registration for PERKSPOT is "administration of a program for enabling participants to obtain discounts from

retailers and service providers." The recitation of services in petitioner's two registrations cover "providing volume discount buying services," and "buying services, namely, providing volume discounts for consumer products and services." In comparing these recitations of services, we note that respondent's specimen of use noted above provides that respondent "partners with top employers, educational institutions, and professional groups to provide member discount programs through a customized, outsourced solution." Petitioner describes its services as "a lifestyle product and service discount and savings program."[42] In view of the foregoing, we find that the parties' services are legally identical.

Because the services described in respondent's registration and petitioner's registrations are legally identical, we must presume that the channels of trade and classes of purchasers are the same. *See In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968) (where there are legally identical goods, the channels of trade and classes of purchasers are considered to be the same); *American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute,* 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994). *See also In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion).

---

[42] Dow Dep., Exhibit 2.

The evidence of record supports the noted presumption because it shows that the channels of trade and classes of consumers actually are the same. Petitioner offers "an employee benefit savings program that human resources and benefits departments, association and other organizations can offer to their employees and members."[43] Petitioner's typical client is "any employer group of 500 or more employees. That ranges from hospitals, schools, universities, associations, charitable foundations, major corporations."[44] Petitioner targets "human resource professionals, personnel, employee activities."[45]

Respondent is a competitor of petitioner.[46] Respondent's typical client is a governmental agency, school district, hospital, or company with 5,000 plus employees.[47] Respondent's sales staff typically target human resource, procurement or employee services personnel.[48]

In view of the foregoing, we find that the services are legally identical, and the channels of trade and classes of consumers are the same.

2. The strength of petitioner's marks, including the number and nature of similar marks in use in connection with similar services, and the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

---

[43] Dow Dep., Exhibit 43.

[44] Dow Dep., p. 13.

[45] Dow Dep., p. 81.

[46] Dow Dep., p. 82.

[47] Smythe Dep., pp. 24-25.

[48] Smythe Dep., pp. 26-27.

The sixth *du Pont* factor requires us to consider evidence pertaining to the number and nature of similar marks in use on similar goods. "The purpose of a defendant introducing third-party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different such marks on the bases of minute distinctions.'" *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005), *quoting Veuve Clicquot Ponsardin v. Palm Bay Imports, Inc.,* Opp'n No. 115,438, 2000 WL 21953664 (TTAB Aug. 4, 2003).

On this record, we cannot conclude that there has been such an impact in the marketplace as a result of the widespread use of the terms PERKS and PERKS coupled with CARD, in connection with the parties' respective services, that minor differences between the third party Perks- formative marks will necessarily enable consumers to distinguish them. Third-party registrations, as discussed above, are not evidence that the registered marks actually have been used in commerce. The third-party websites containing the term "Perks" involving volume discount buying services or similar services are not accompanied by any other evidence indicating the length of time said marks have been in use, the degree of exposure, or the popularity of such marks vis-a-vis the relevant purchasing public. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 73 USPQ2d at 1693-94. Accordingly, this factor remains neutral in our analysis.

In determining the strength of a mark, we consider both its inherent strength based on the nature of the mark itself and its commercial strength, based on the marketplace recognition value of the mark. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning).") *Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.,* 101 USPQ2d 1163, 1171-72 (TTAB 2011) (same); *Tea Board of India v. Republic of Tea Inc.,* 80 USPQ2d 1881, 1899 (TTAB 2006); McCarthy on Trademarks and Unfair Competition § 11:83 (4th ed. 2013) ("The first enquiry focuses on the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value of the mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use."). Market strength is the extent to which the relevant public recognizes a mark as denoting a single source. *Tea Board of India v. Republic of Tea Inc.,* 80 USPQ2d at 1899. In other words, it is similar to acquired distinctiveness.

The record establishes that the term "perks" has little conceptual strength. In the unusual circumstances presented in this case, despite petitioner's incontestable registration for the mark PERKS for "providing volume discount buying services to others," we have found that the separately registered mark **Perks** used in connection with "buying services, namely, providing volume discounts for consumer products and services via a magnetically encoded card" is merely descriptive, and must be cancelled. Therefore, for the purpose of

42

determining the strength of PERKS in an *inter partes* proceeding involving Section 2(d), we find on this record that it is descriptive. By so finding, we are not holding, nor could we, that this registration is invalid because the mark PERKS is merely descriptive. Under *Park 'N Fly v. Dollar Park and Fly, Inc.,* 224 USPQ at 330, such a ruling is off-limits.[49] While an incontestable registration may not be *challenged as invalid* for mere descriptiveness, for purposes of determining the inherent strength of a mark as a factor relevant to likelihood of confusion, incontestability does not preclude us from finding that, in terms of conceptual strength, PERKS is descriptive. *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 935 (4th Cir.1995). Likewise, we find that the mark PERKSCARD for "buying services, namely, providing volume discounts for consumer products and services" is, for purposes of determining the inherent strength of a mark as a factor relevant to likelihood of confusion, also descriptive because it describes a card used to obtain the perks or benefits. *See* Dow Dep. Exhibit 18 which provides the following:

> PerksCard
> Your one and only card for savings …

This characterization of petitioner's marks is corroborated by the numerous third-party registrations for marks that include the designation PERKS that the Office has allowed to register, one over another, indicating that the term "Perks" is

---

[49] *See also In re Chippendales USA Inc.,* 622 F.2d 1346, 96 USPQ2d 1681, 1685 (Fed. Cir. 2010) ("once a mark has achieved incontestable status under 15 U.S.C. § 1065, it is entitled to the benefits of section 1115(b), which precludes all but a limited number of challenges to a mark's validity or enforceability"); *Sunrise Jewelry Mfg. Corp. v. Fred S.A.,* 175 F.3d 1322, 50 USPQ2d 1532, 1534 (Fed. Cir. 1999) ("an incontestable mark cannot be challenged, for example, for mere descriptiveness").

not particularly distinctive for the administration of programs enabling participants to obtain discounts. *See In re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 722 (CCPA 1968).

In *Plus Products v. Natural Organics, Inc.*, 204 USPQ 773 (TTAB 1979), which involved an opposition to the registration of NATURE'S PLUS for vitamins by the owner of the mark PLUS, also for vitamins, the applicant made of record eight third-party registrations that issued prior to opposer's registration, and seven registrations that issued after, all for marks containing the word PLUS and all for goods that are the same or closely related to vitamins. The Board drew the following inferences from the co-existence of these registrations:

1. Opposer was satisfied to register PLUS side-by-side with eight existing registrations;

2. The Patent and Trademark Office has historically registered PLUS marks for vitamins to different parties so long as there has been some difference, not necessarily created by a distinctive word, between the marks as a whole, e.g., VITAMINS PLUS and IRON PLUS; and

3. A number of different trademark owners have believed, over a long interval of time, that various PLUS marks can be used and registered side-by-side without causing confusion provided there are at least minimal differences between the marks.

*Id*. at 779. *See also Jerrold Electronics Corp. v. The Magnavox Company*, 199 USPQ 751, 758 (TTAB 1978) (third-party registrations "reflect a belief, at least by the

registrants, who would be most concerned about avoiding confusion and mistake, that various 'STAR' marks can coexist provided that there is a difference."); *In re Sien Equipment Co.*, 189 USPQ 586, 588 (TTAB 1975) (the suggestive meaning of the word "Brute" explains the numerous third-party registrations incorporating that word with other wording or material no matter how little additional significance they may add to the word "Brute" *per se*).

Because of the descriptive nature of the term "Perks," the third-party registrations, and the evidence of third-party use of the term "Perks" referring to various types of benefits, the same inferences apply in this case as in *Plus Products*. It is clear from the third-party registrations that any addition to the word "Perks" has been sufficient for the Patent and Trademark Office to view these marks as being sufficiently different from petitioner's registered marks, and from each other, such as not to cause confusion. We presume that petitioner did not object to the registration of these third-party marks, as the "Perk"-formative registrations listed in the table above all issued after the registration of petitioner's PERKS registration without challenge by petitioner. In fact, when the application for Registration No. 3291476 for the mark PERQZ was cited as a bar to petitioner's application for Registration No. 3210654 for the mark **Perks,** petitioner argued "PERQS is sufficiently distinctive from the [petitioner's] request for registration of Perks,"[50] and "the letter Q sufficiently distinguishes Perks from Perkqs [sic]."[51]

---

[50] Registration No. 3210654, prosecution history file, petitioner's June 21, 2006 response to Office action. Because Registration No. 3210654 is the subject of respondent's counterclaim for cancellation, the prosecution history is of record pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b).

Unlike a situation involving an arbitrary or fanciful mark, the addition of other matter to a descriptive word like "Perks" may be enough to distinguish it from another mark. *In re Hunke & Jocheim*, 185 USPQ 188, 189 (TTAB 1975). As explained in *Sure-Fit Products Company v. Saltzson Drapery Company*, 254 F.2d 158, 117 USPQ 295, 297 (CCPA 1958):

> It seems both logical and obvious to us that where a party chooses a trademark which is inherently weak, he will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights. The essence of all we have said is that in the former case there is not the possibility of confusion that exists in the latter case.

Under these circumstances, marks comprising the term "Perks" in connection with discount buying programs should be accorded a narrow scope of protection because competitors in this field should be free to use the term "Perks" when describing their own discount buying services offered to employees and customers as a benefit, even if petitioner was the first to use or register that term. *See In re Styleclick.com Inc.*, 58 USPQ2d 1523, 1527 (TTAB 2001).

Keeping this in mind, we find that the mark PERKSPOT is sufficiently different from the marks PERKS and PERKSCARD to avoid a likelihood of confusion. Although the marks all feature the term "Perk," respondent's mark PERKSPOT has a separate and distinct meaning and commercial impression; that is, the place for perks. Since, as discussed above, the term "perks" is descriptive,

---

[51] Registration No. 3210654, prosecution history file, petitioner's September 8, 2006 response to Office action.

consumers are unlikely to place much source identifying function in the term "perk" or "perks" *per se*; rather, consumers will consider the mark PERKSPOT in its entirety and consider the mark as signifying the place for perks.

We recognize that respondent's mark PERKSPOT differs from petitioner's mark PERKS only by the inclusion of the word "Spot" and that it differs from petitioner's mark PERKSCARD by substitution of the word "Spot" for "Card," and that such differences, in other circumstances, might be insufficient to distinguish two marks for identical goods or services. However, given the fact that third-party registrations for administration of discount programs enabling participants to obtain discounts have issued for marks which differ from petitioner's marks by the inclusion of terms such as "Share,"[52] "Chase,"[53] and "Resources"[54] and without objection by the registrant, it would appear that the registrant itself considers slight differences sufficient to distinguish the marks. As we have found, the mark PERKS is, as a conceptual matter, descriptive, and therefore the scope of protection to which that registration is entitled is quite limited. The addition of matter has been found sufficient to distinguish the marks under circumstances where the common element is descriptive or highly suggestive and/or has been frequently used and/or registered by others in the same or related fields. *See, e.g.*, *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066 (TTAB 2011) (ZU ELEMENTS, stylized, not confusingly similar to ELEMENTS for identical apparel);

---

[52] Registration No. 4029941 for the mark PerkShare.

[53] Registration No. 3590776 for the mark PERKCHASE.

[54] Registration No. 2930976 for the mark PERKS RESOURCES.

*Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ2d 1313 (TTAB 2005) (NORTON MCNAUGHTON ESSENTIALS for ladies' sportswear not confusingly similar to ESSENTIALS for women's clothing because ESSENTIALS is a highly suggestive term for articles of clothing); *In re Hunke & Jochheim*, 185 USPQ 188, 189 (TTAB 1975) (HIG-DURABLE for stationery articles not likely to cause confusion with DURABL, on the Supplemental Register, for record books); *In re Merchandising Motivation, Inc.*, 184 USPQ 364 (TTAB 1974) (MEN'S WEAR for a semi-monthly magazine not confusingly similar to MMI MENSWEAR for fashion consulting for men because "MENSWEAR" is merely descriptive of such services).

Likewise, viewing the marks PERKSPOT, PERKS and PERKSCARD in the context of the facts and circumstances presented by the record in this case, we find that the word "Spot" in respondent's mark is sufficient to render respondent's mark distinguishable from petitioner's marks PERKS and PERKSCARD. In other words, in this case, the strength or weakness of the term "Perks" in petitioner's marks is an important factor. *See, e.g., Kellogg Co. v. Pack-Em Enterprises Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single duPont factor may not be dispositive. … 'each [of the thirteen elements] may from case to case play a dominant role.'").

3.     The nature and extent of any actual confusion.

Petitioner contends that "[t]here have been eight (8) instances made of record in this proceeding where professionals, customer employees or other third persons

have actually confused Perks and PerkSpot."[55]   In analyzing these purported instances of actual confusion, we note that where petitioner has adopted a weak mark, "his competitors may come closer to his mark than would be the case with a strong mark without violating his rights."  *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992), *quoting Sure-Fit Products Company v. Saltzson Drapery Company*, 117 USPQ at 296.   "If any confusion results, that is a risk the plaintiff accepted when it decided to identify the product with a mark that uses a well-known descriptive phrase."  *KP Permanent v. Lasting Impression,* 543 U.S. 111, 72 USPQ2d 1833, 1838 (2004).   *See also Milwaukee Nut Co. v. Brewster Food Service,* 277 F.2d 190, 125 USPQ 399, 401 (CCPA 1960) ("appellee, in adopting a word which is highly suggestive to the trade in which it was catering, ran the risk of having similar merchandise sold by others for the same purpose to the same trade offered to the witness when he requested 'BEER NUTS.'"); *Bass Pro Trademarks, LLC v. Sportsman's Warehouse, Inc.,* 89 USPQ2d 1844, 1857 (TTAB 2008) ("when a business adopts a mark, or a portion of a mark incorporating a descriptive term, it assumes the risk that competitors may also use that descriptive term.").

Petitioner designated the testimony and evidence relating to the instances of actual confusion as confidential.  Accordingly, we will not identify the companies or individuals involved.

---

[55] Petitioner's Brief, p. 15.

a.     Emails in the Smythe deposition.

Petitioner identified three sets of email chains that it contends show evidence of actual confusion.

1.     Exhibit 50 is an email chain from one of petitioner's sales persons to a prospective customer seeking to enroll the customer in petitioner's program.   The prospective customer wrote to petitioner's representative that she "received this email attached last week.  Is this the same company?"  Presumably, the prospective customer is referring to an email from respondent.  This is not evidence of actual confusion because it indicates the prospective customer suspected that there were two different companies seeking business.  *See Marshall Field & Co. v. Mrs. Fields Cookies,* 25 USPQ 1321, 1334 (TTAB 1992).  Another reason this email chain is unpersuasive is that the prospective customer was not called as a witness and questioned and cross-examined as to the reasons for her inquiry.  *Id.*

Petitioner argues that respondent "could have subpoenaed and deposed the confused individuals identified in the email strings" and that respondent "failed to do so should not be held against" petitioner.[56]   However, properly introducing instances of actual confusion into the record and persuading the trier of fact as to the probative value of such evidence is petitioner's burden.  *See Georgia-Pacific Corp. v. Great Plains Bag Co.,* 614 F.2d 757, 204 USPQ 697, 701 (CCPA 1980) ("Actual confusion is entitled to great weight but only if properly proven.").

---

[56] Petitioner's Rebuttal Brief, p. 24.

2.    Exhibit 51 is an email chain from a prospective customer of respondent who reported that her "corporate office is working with someone else from your company and has been for some time."  When respondent's Mr. Smythe asked for the name of the person with whom she had been working [one of petitioner's sales persons], the prospective customer noted that "maybe it isn't part of your company." This email chain does not show actual confusion because the prospective customer also realized that there were two different entities.  Moreover, the evidence does nothing to explain why the individual drew the conclusion that another individual in the same organization may have been working with one of the parties.  The confusion, if any, could be explained by factors other than the similarity of the marks, such as the way in which the individual was informed of or became aware of the work of another individual in the organization.

3.    Exhibit 52 is an email chain from one of respondent's prospective or actual customers forwarding a sales inquiry from petitioner.  Respondent's prospective or actual customer asked respondent's sales representative whether "you would be able to assist me with this?"  While this email chain is offered by petitioner to indicate the customer's "state of mind" rather than for the truth of the matter contained therein, its probative value is diminished by the fact that the prospective or actual customer was not called as a witness to testify and be subject to cross-examination as to the circumstances and conditions under which she received the email and why she contacted respondent.

b.      Dow Deposition

1.      Robert Dow, petitioner's President, testified that during a WebEx conference with a prospective client who was looking at petitioner's website, the prospective client "continually referred to us as PerkSpot."[57]

> Q.      And what did you say to the customer when he kept doing that?
>
> A.      We made a comment that we are PerksCard, not PerkSpot.  He laughed and then we continued on with the presentation, and again when seeing the PerksCard site he referred to us as Perkspot.
>
> Q.      And did you try to correct him again?
>
> A.      We did.
>
> Q.      And how did he respond?
>
> A.      Again, he apologized, laughed, and we continued on with the presentation.
>
> Q.      And so during this – this was a telephone conversation?
>
> A.      It was telephone and WebEx.  So he was actually looking at our Web site via the computer while we were doing the presentation.
>
> Q.      So just to be clear, he was looking at the PerksCard Web [sic] site?
>
> A.      That's correct.[58]

The probative value of this testimony is limited because the prospective client was not called as a witness to testify and be cross examined as to why he referred to petitioner as PerkSpot.  It could have been a "slip of the tongue," rather than

---

[57] Dow Dep., p. 86.

[58] Dow Dep., pp. 85-86.

confusion. While petitioner was unable to close this sale, there is no testimony that it was because the prospective customer confused the source of petitioner's services with the source of respondent's services.

2.    Mr. Dow testified that "[w]e had an incident where a [customer] called our customer service center, spoke to one of our customer service reps thinking they were calling for Perkspot, and our call center rep handled that call."[59]   This is technically hearsay within hearsay (*i.e.,* the call center representative reported what the witness was thinking), and although there are instances where hearsay statements concerning alleged instances of actual confusion are admissible as "present sense impressions" under Fed. R. Evid. 803(1), we do not believe this highly generalized testimony provides us with enough circumstantial guarantees of trustworthiness to warrant attributing any probative value to it..

3.    Exhibit 33 is an email chain from a prospective client responding to an email from petitioner's sales representative who sent the customer a summary of a recent sales presentation. Despite referencing "PerksCard" four times in his email, the prospective customer wrote, "is there someway [sic] that I could have a username and password to walk my client thought the PerkSpot web site? If that requires me to become a member of an existing PerksCard client, that's OK with me." Since the prospective customer was not called as a witness to explain his reference to PerkSpot, we do not know whether the prospective client was confused or whether he just made a "slip of the tongue." While the prospective client

---

[59] Dow Dep., p. 87.

substituted PerkSpot for PERKSCARD, there is no evidence that this prospective client, or any prospective customer, ever retained respondent's services thinking they came from petitioner.

> The Lanham Act seeks to prevent consumer confusion that enables a seller to pass "off his goods as the goods of another." *Programmed Tax Systems, Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1132 [ 197 USPQ 509 ] (S.D.N.Y. 1977) (quoting *Jean Patou, Inc, v. Jacqueline Cochran, Inc.,* 201 F.Supp. 861, 863 [ 133 USPQ 242 ] (S.D.N.Y. 1962), *aff'd,* 312 F.2d 125 [ 136 USPQ 236 ] (2d Cir. 1963). In *Programmed Tax Systems,* the court explained that the relevant confusion is that which affects "the purchasing and selling of the goods or services in question." *Id.* The *Restatement* concurs, citing to Judge Lasker's opinion in *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 450 [ 213 USPQ 1091 ] (S.D.N.Y. 1982), for the proposition that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Restatement, supra,* § 20 reporter's note at 179.

*Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 21 USPQ2d 1041, 1046 (2d Cir. 1991). It is not clear what prompted the error on the part of petitioner's prospective customer.

4.    Exhibit 34 is an email chain from one of petitioner's customers to one of petitioner's project managers complaining that the customer's Vice President of Human Resources is getting messages from a John Hughes asking her to sign up for Perks even though the customer is "already a member of Perks." John Hughes was not employed by petitioner.[60] One of petitioner's employees investigated by calling respondent's telephone number which listed John Hughes in the employee phone

---

[60] Dow Dep., p. 92.

directory.[61] As indicated above, the customer's Vice President assumed John Hughes was selling petitioner's services, but there is no evidence that this customer or any customer ever retained respondent's services thinking the services were rendered by or associated with petitioner.

5. Exhibit 35 is an email chain from one of petitioner's executives to a "professional" who was working with petitioner on a product launch for some of petitioner's customers. When responding to petitioner's inquiry, the "professional" apparently looked at respondent's website instead of petitioner's website. When petitioner pointed out Ms. Nelson's mistake, she wrote "WOW – talk about a rookie error!!! The funny thing is I get annoyed with people on my end when they call you a Perkspot or call your competitor Perksgroup." Because the "professional" was not called as a witness, we do not know why the "professional" accessed respondent's website when she was clearly aware that respondent and petitioner were two distinct entities. In other words, we do not know whether she confused the source of the services offered by respondent and petitioner, or whether the way in which she attempted to access petitioner's website inadvertently led her to respondent's website.

After carefully reviewing these purported instances of actual confusion, there is no reason to believe that the so-called confusion represented by these instances reflect confusion as to source in the form of either a potential diversion of sales, damage to goodwill, or loss of control over reputation because of the similarity of the

---

[61] Dow Dep., p. 94.

marks. *See General Instrument Corp. v. Autotote Ltd.,* 220 USPQ 283, 288 (TTAB 1983) ("None of the evidence offered by opposer concerning these instances of alleged actual confusion suggests that mistakes were made as the result of use of applicant's mark."). We have given these purported instances of confusion appropriate consideration. In this regard, evidence of actual confusion "is too important to be established by means of an inference, unsupported by corroborating evidence." *Toys "R" Us, Inc. v. Lamps R Us,* 219 USPQ 340, 346 (TTAB 1983). Accordingly, we find that this evidence has *de minimis* value.

4.      Balancing the *du Pont* factors.

Because of the descriptive nature of the marks PERKS and PERKSCARD, the proliferation of registered "Perks" marks, the use of "Perks" to describe employee and customer benefits, the marks PERKS and PERKSCARD are entitled to only a very narrow scope of protection or exclusivity of use. Accordingly, we find that consumers are likely able to distinguish between different PERKS marks based on small differences in the marks. Thus, respondent's mark PERKSPOT for "administration of a program for enabling participants to obtain discounts from retailers and service providers" is not likely to cause confusion with petitioner's marks PERKS for "providing volume discount buying services to others or PERKSCARD for "buying services, namely, providing volume discounts for consumer products and services."

**Decision**:      Respondent's counterclaim to cancel petitioner's pleaded registrations on the ground that petitioner's marks are generic is dismissed.

Judgment is entered in respondent's favor on its counterclaim to cancel Registration No. 3210654 as involving a descriptive term. However, since the registration has already been cancelled, no further action is necessary by the Board.

Petitioner's petition to cancel respondent's registration on the ground of likelihood of confusion is dismissed.